Lanzinger, J.
{¶ 1} In this case, we are asked to determine whether the state is barred by the Cruel and Unusual Punishments and Double Jeopardy Clauses of the United States and Ohio Constitutions from carrying out the death penalty against Romell Broom when attempts to insert an IV catheter were unsuccessful in an earlier scheduled execution. We hold that the state is not barred from carrying out his execution and therefore affirm the judgment of the court of appeals.
Case Background
{¶ 2} On October 3, 1985, a jury convicted appellant, Romell Broom, of aggravated murder with two felony-murder specifications (kidnapping and rape) in connection with the death of 14-year-old Tryna Middleton. Broom received a sentence of death, which was affirmed on appeal. 40 Ohio St.3d 277, 533 N.E.2d 682 (1988). After Broom exhausted his postconviction and federal remedies, this court ordered the execution to proceed on September 15, 2009. 123 Ohio St.3d 114, 2009-Ohio-4778, 914 N.E.2d 392, ¶ 21 and fn. 2.

Facts of September 15, 2009

{¶ 3} Broom was transported to the Southern Ohio Correctional Facility (“Lucasville”) on September 14, 2009, in anticipation of his execution scheduled for the next day. Upon his arrival at Lucasville, a nurse and a phlebotomist conducted a vein assessment and found that Broom’s right-arm vein appeared accessible, but his left-arm vein seemed less so. Prison officials communicated this information to Edwin C. Voorhies Jr., the regional director for the Office of Prisons of the Ohio Department of Rehabilitation and Correction (“ODRC”), and the medical team assured him that this would not present a problem.
{¶ 4} At 1:59 p.m. on September 15, the warden finished reading the death warrant to Broom. One minute later, Team Members 9 (a female) and 21 (a male) entered the holding cell to prepare the catheter sites.
{¶ 5} Team Member 9 made three attempts to insert a catheter into Broom’s left arm but was unable to access a vein. At the same time, Team Member 21 *62 made three unsuccessful stabs into Broom’s right arm. After a short break, Member 9 made two more insertions, the second of which caused Broom to scream aloud from the pain.
{¶ 6} Member 21 managed to insert the TV catheter into a vein, but then he lost the vein and blood began running down Broom’s arm. When that occurred, Member 9 rushed out of the room, saying “no” when a security officer asked if she was okay.
{¶ 7} Director Voorhies testified that he could tell there was a problem in the first 10 to 15 minutes. Warden Phillip Kerns saw the team make six or seven attempts on Broom’s veins during the same 10-to-15-minute period. According to Kerns, the team members did hit veins, but as soon as they started the saline drip, the vein would bulge, making it unusable.
{¶ 8} About 15 minutes into the process, Kerns and Voorhies saw Member 9 leave the holding cell. Voorhies described her as sweating “profusely” and heard her say that she and Member 21 had both accessed veins, but the veins “blew.” Member 17 then entered the holding cell and made “several attempts” to access a vein in Broom’s left arm. Simultaneously, Member 21 continued his attempts on Broom’s right arm.
{¶ 9} Terry Collins, who was then the director of the ODRC, called a break about 45 minutes into the process to consult with the medical team. The break lasted 20 to 25 minutes. The medical team reported that they were gaining IV access but could not sustain it when they tried to run saline through the line. They expressed “clear concern” about whether they would get usable veins. But because they said that there was a reasonable chance of establishing venous access, the decision was made to continue.
{¶ 10} By this time, Broom was in a great deal of pain from the puncture wounds, which made it difficult for him to move or stretch his arms. The second session commenced with three medical team members — 9, 17, and 21 — examining Broom’s arms and hands for possible injection sites. For the first time, they also began examining areas around and above his elbow as well as his legs. They also reused previous insertion sites, and as they continued inserting catheter needles into already swollen and bruised sites, Broom covered his eyes and began to cry from the pain. Director Voorhies remarked that he had never before seen an inmate cry during the process of venous access.
{¶ 11} After another ten minutes or so, Warden Kerns asked a nurse to contact the Lucasville physician to see if she would assess Broom’s veins and offer advice about finding a suitable vein. Broom later stated that he saw “an Asian woman,” whom he erroneously identified as “the head nurse,” enter the chamber. Someone handed her a needle, and when she inserted it, she struck bone, and Broom *63 screamed from the pain. At the same time, another team member was attempting to access a vein in Broom’s right ankle.
{¶ 12} The Lucasville physician confirmed that she came to Broom’s cell, examined his foot, and made one unsuccessful attempt to insert a needle but quickly concluded that the effort would not work. By doing so, she disobeyed the warden’s express instructions to observe only and not get involved. The physician examined Broom’s foot but could see no other vein.
{¶ 13} After the physician departed, the medical team continued trying to establish an TV line for another five to ten minutes. In all, the second session lasted approximately 35 to 40 minutes.
{¶ 14} During the second break, the medical team advised that even if they successfully accessed a vein, they were not confident that the site would remain viable throughout the execution process. The governor’s office had signaled its willingness to grant a reprieve, and so the decision was made to halt the execution for the day.
{¶ 15} Dr. Jonathan Groner examined and photographed Broom three or four days afterward. The photographs show 18 injection sites: one on each bicep, four on his left antecupital (forearm), three on his right antecupital, three on his left wrist, one on the back of his left hand, three on the back of his right hand, and one on each ankle. Prison officials later confirmed that he was stuck at least 18 times.
{¶ 16} Dr. Mark Heath met with Broom one week after the event. Dr. Heath observed “considerable bruising” and a lot of “deep and superficial” tissue damage consistent with multiple probing. Dr. Heath also posited that the actual number of catheter insertions was much higher than the number of needle marks, because according to what Broom told him, the medical team would withdraw the catheter partway and then reinsert it at a different angle, a procedure known as “fishing.”

Subsequent Litigation

{¶ 17} Broom has pursued multiple avenues challenging any further attempt by the state to execute him. He filed a civil-rights complaint under 42 U.S.C. 1983 (“Section 1983”) in the United States District Court for the Southern District of Ohio on September 18, 2009. He argued that a second attempt to execute him would violate the Eighth Amendment’s prohibition on cruel and unusual punishments and the Fifth Amendment right against double jeopardy. The federal court dismissed these claims without prejudice as procedurally improper. Broom v. Strickland, S.D.Ohio No. 2:09-cv-823, 2010 WL 3447741 (Aug. 27, 2010). On-the same day that he filed his Section 1983 complaint, Broom filed an original action for a writ of habeas corpus in this court (case No. 2009-1686), which he *64 later voluntarily dismissed. In re Broom, 123 Ohio St.3d 1485, 2009-Ohio-5883, 916 N.E.2d 482. On September 14, 2010, Broom filed a federal habeas action, which is stayed pending exhaustion of his Eighth Amendment claim in state court, Broom v. Bobby, N.D.Ohio No. 1:10 CV 2058, 2010 WL 4806820 (Nov. 18, 2010), and a second state-court habeas action (case No. 2010-1609), which this court dismissed, In re Broom, 127 Ohio St.3d 1450, 2010-Ohio-5836, 937 N.E.2d 1039.
{¶ 18} On September 15, 2010, Broom filed a successive petition for postconviction relief in the Cuyahoga County Court of Common Pleas, asserting that any future attempt to execute him would be unconstitutional. On April 7, 2011, the trial court denied Broom’s petition without conducting an evidentiary hearing. The trial court held that a second execution attempt would not violate the Fifth or Eighth Amendment. And the court concluded that Broom’s experience of repeated needle sticks, although “unpleasant,” was not sufficiently torturous to implicate the Eighth Amendment.
{¶ 19} The Eighth District Court of Appeals affirmed on different grounds. Thereafter, the court denied Broom’s request for en banc review. State v. Broom, 8th Dist. Cuyahoga No. 96747 (Apr. 5, 2012).
{¶ 20} Broom appealed to this court, and we accepted jurisdiction on three propositions of law:
(1) The lower courts erred when they found that the Cruel and Unusual Punishments Clauses of the Eighth and Fourteenth Amendments to the United States Constitution, and Article I, Section 9 of the Ohio Constitution do not bar another attempt to execute Broom.
(2) The lower courts denied Broom due process of law, an adequate corrective process, and his day in court on his “no multiple attempts” claims when [a] the trial court denied him discovery and a hearing, and [b] the appellate court, in a case of first impression and without prior notice to Broom, adopted a new case-specific and fact-based standard for adjudicating Broom’s unique and rare constitutional claims, and then refused to remand the case to the trial court so that Broom could develop evidence and present argument that he meets that new standard.
(3) The lower courts erred when they found that a second attempt to execute Broom would not violate the prohibitions against being placed twice in jeopardy for the same offense in the Fifth and Fourteenth Amendments to the United States Constitution and Article I, Section 10 of the Ohio Constitution.
*65 See 139 Ohio St.3d 1403, 2014-Ohio-2245, 9 N.E.3d 1062. For ease of discussion, we will address them out of order.
Analysis

Double Jeopardy

{¶ 21} The Fifth Amendment provides that no person shall “be subject for the same offence to be twice put in jeopardy of life or limb.” The Double Jeopardy Clause protects against three distinct evils: a second prosecution for the same offense after acquittal, a second prosecution for the same offense after conviction, and multiple punishments for the same offense. North Carolina v. Pearce, 395 U.S. 711, 717, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969), overruled on other grounds, Alabama v. Smith, 490 U.S. 794, 109 S.Ct. 2201, 104 L.Ed.2d 865 (1989). Ohio’s constitutional prohibition against double jeopardy, Article I, Section 10, is coextensive with the federal clause. State v. Brewer, 121 Ohio St.3d 202, 2009-Ohio-593, 903 N.E.2d 284, ¶ 14.
{¶ 22} Broom argues that a second execution attempt would be an unconstitutional second punishment. He contends that for double-jeopardy purposes, the attempt to execute him began with the reading of the death warrant or at the very latest with the first insertion of a needle. Broom claims that once the attempt to execute him began, he had a reasonable expectation in the “finality” of his death sentence, meaning that his death should have occurred on September 15, 2009, because R.C. 2949.22(B) requires that a death sentence be executed on the day designated by a court. Because his life was once placed in “jeopardy” by virtue of the two hours of painful efforts to insert needles into his body, Broom argues, he may not again be required to undergo that same punishment.
{¶ 23} The court of appeals rejected this claim on the grounds that Broom has not yet been punished because his punishment is death: “An inmate can only be put to death once, and that process legislatively begins with the application of the lethal drugs.” 2012-Ohio-587, 2012 WL 504504, ¶ 23, citing R.C. 2949.22(A). The court relied on Louisiana ex rel. Francis v. Resweber, 329 U.S. 459, 67 S.Ct. 374, 91 L.Ed. 422 (1947), in making this conclusion. In Resweber, Willie Francis was placed in the electric chair, but when the switch was thrown, there was a mechanical difficulty and death did not result. Id. at 460. A plurality of the United States Supreme Court held that a proposed second attempt to execute Francis did not violate the Fifth, Eighth or Fourteenth Amendments. Because the court viewed the failed execution as an accident, it determined that the Double Jeopardy Clause did not preclude the state from carrying out the sentence. Id. at 463.
*66 {¶ 24} The Eighth District noted that the Resweber dissenters “distinguished the application of electricity to the inmate from merely placing the inmate in the electric chair with no application of electricity.” 2012-Ohio-587, 2012 WL 504504, at ¶ 22. By analogy, the court of appeals reasoned, the insertion of TV lines is merely a “preparatory” step to the execution. Until the lethal drugs flow through the tubes, the court reasoned, the state has not yet punished Broom within the meaning of the Fifth Amendment. Id. at ¶ 23. Thus, according to the court, the Double Jeopardy Clause has no application to multiple execution attempts. Id. at ¶ 25.
{¶25} The state agrees with the assessment of the court of appeals. It contends that when the preparatory actions proved unsuccessful, the state halted the execution and the imposed sentence was never carried out. Therefore, the state argues, a second attempt to carry out that sentence will not violate the Double Jeopardy Clause. The state cites R.C. 2949.22(A), which provides that “a death sentence shall be executed by causing the application to the person, upon whom the sentence was imposed, of a lethal injection of a drug or combination of drugs.” (Emphasis added.) The state reads this language to mean that the execution attempt does not begin until lethal force or measure is applied.
{¶ 26} We agree. There is no question that lethal drugs did not enter Broom’s body. The execution attempt was halted after preparations to establish a viable IV line were unsuccessful. The establishment of viable IV lines is a necessary preliminary step, but it does not, by itself, place the prisoner at risk of death. As the statute makes clear, the execution commences when the lethal drug enters the IV line. In this case, because the attempt did not proceed to the point of injection of a lethal drug into the IV line, jeopardy never attached. Because there is no violation of the Fifth Amendment protection against double jeopardy, the state is not barred from a second attempt to execute Broom’s death sentence.

Due Process

{¶ 27} In his second proposition of law, Broom raises two due-process concerns. First, he alleges that the trial court should have permitted him to conduct discovery and should have held a hearing on his petition for postconviction relief. Second, he argues that the Eighth District adopted a new standard — deliberate indifference — to analyze his petition and that the appellate court should have remanded the case to the trial court to hold a hearing under that standard.
Discovery and Hearing
{¶ 28} A postconviction proceeding is not an appeal of a criminal conviction but, rather, is a collateral, civil attack on a criminal judgment. State v. Steffen, 70 Ohio St.3d 399, 410, 639 N.E.2d 67 (1994). The right to file a postconviction petition is a statutory right, not a constitutional right. State v. Calhoun, 86 Ohio *67 St.3d 279, 281, 714 N.E.2d 905 (1999). R.C. 2953.21 grants a petitioner only those rights specifically enumerated in its provisions and no more. Calhoun at 281. This court has never held that there is a right to discovery in postconviction proceedings. See State ex rel. Love v. Cuyahoga Cty. Prosecutor’s Office, 87 Ohio St.3d 158, 159, 718 N.E.2d 426 (1999). And because R.C. 2953.21 is silent about discovery, the decision to grant or deny a request for discovery rests with a trial court’s sound discretion.
{¶29} An evidentiary hearing is not automatically guaranteed each time a defendant files a petition for postconviction relief. R.C. 2953.21(C) (“Before granting a hearing on a petition * * *, the court shall determine whether there are substantive grounds for relief’ [emphasis added]). A trial court has the discretion to deny a postconviction petition without discovery or an evidentiary hearing if the petition, supporting affidavits, documentary evidence, and trial record do not demonstrate “sufficient operative facts to establish substantive grounds for relief.” Calhoun at paragraph two of the syllabus. To warrant an evidentiary hearing in a postconviction proceeding, a petitioner must submit evidence outside the record that sufficiently establishes that the petitioner is entitled to relief on one or more asserted constitutional grounds. R.C. 2953.21(A); Calhoun at 283.
{¶ 30} The decision to grant or deny a postconviction petition should be upheld absent an abuse of discretion, and a reviewing court should not overrule the trial court’s determination if it is supported by competent and credible evidence. State v. Gondor, 112 Ohio St.3d 377, 2006-Ohio-6679, 860 N.E.2d 77, ¶58.
{¶ 31} Here, there is no indication that further discovery or a hearing is required. Broom submitted an affidavit and other documentary exhibits, deposition testimony from participants at his attempted execution and other transcripts from the federal proceeding in Cooey v. Strickland, S.D.Ohio No. 2:04-cv-1156, 2009 WL 4842393 (Dec. 7, 2009), and photographs of his puncture marks. There is no dispute as to any operative fact in connection with the events of September 14 and 15, 2009. Although he made a vague request in his postconviction petition for discovery and a hearing, a review of the docket shows that Broom never filed a discovery request while the matter was pending in the trial court. He also has failed to proffer what that additional discovery was or how a hearing would aid the trial court in resolving the legal questions before it. We agree with the court of appeals that the trial court based its decision on the undisputed and voluminous evidence it had and that the trial judge did not abuse his discretion in denying Broom’s petition without additional discovery or an evidentiary hearing. There is no need for remand on this issue.
Deliberate Indifference
{¶ 32} The trial court dismissed Broom’s postconviction petition because, although “repeated needle sticks are indeed unpleasant, they are not torture,” *68 and because there was not a substantial risk of serious harm present. The Eighth District, however, used a different method of reasoning. After holding that multiple execution attempts do not per se constitute cruel and unusual punishment, 2012-Ohio-587, 2012 WL 504504, at ¶ 24, the majority opinion divided Broom’s allegations into two categories: injuries allegedly sustained as a result of the state’s following its execution protocol and injuries allegedly sustained as a result of the state’s deviating from its execution protocol. Treating the first category as a facial challenge to Ohio’s execution protocol, the court of appeals rejected the challenge as untimely. Id. at ¶ 31 and 34. The court also cited federal-court decisions affirming the constitutionality of state lethal-injection protocols. Id. at ¶ 35, citing Baze v. Rees, 553 U.S. 35, 128 S.Ct. 1520, 170 L.Ed.2d 420 (2008) (plurality opinion) (affirming Kentucky’s three-drug execution protocol); Cooey v. Strickland, 589 F.3d 210, 227-228 (6th Cir.2009) (holding that the failure to impose a time limit on the search for accessible veins did not make Ohio’s protocol unconstitutional).
{¶ 33} The Eighth District then separately analyzed Broom’s allegations that prison officials deviated from Ohio’s execution protocol in his attempted execution using the conditions-of-confmement standard, which requires proof of a state official’s subjective state of mind. 2012-Ohio-587, 2012 WL 504504, at ¶ 47-48.
{¶ 34} We disagree with this analysis. The process of carrying out an execution is more analogous to the method-of-execution cases than to conditions-of-confinement cases. Moreover, according to the plurality opinion in Baze, to prevail on an Eighth Amendment claim based on a risk of future harm, “there must be a ‘substantial risk of serious harm,’ an ‘objectively intolerable risk of harm.’ ” (Emphasis added.) Baze at 50, quoting Farmer v. Brennan, 511 U.S. 825, 842, 846, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994), and fn. 9. This formulation appears irreconcilable with a requirement of proof of a prison official’s subjective intent. Jackson v. Danberg, 594 F.3d 210, 223 (3d Cir.2010), fn. 16 (Baze does not incorporate deliberate-indifference language into method-of-execution cases).
{¶ 35} Although we do not agree with the Eighth District’s use of the deliberate-indifference standard, the trial court properly relied on Resweber and Baze to shape its analysis. As there was no due-process violation, it is not necessary to remand for a further hearing.

Cruel and Unusual Punishment

The Eighth Amendment to the’U.S. Constitution
{¶ 36} The Eighth Amendment to the United States Constitution states, “Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted.” The death penalty has been acknowledged as an *69 acceptable form of punishment since the adoption of the United States Constitution and the Bill of Rights. Glossip v. Gross, — U.S.—, 135 S.Ct. 2726, 2731, 192 L.Ed.2d 761 (2015). The United States Supreme Court has recognized that the Eighth Amendment prohibition against cruel and unusual punishments imposes two separate limitations. The first is a requirement of proportionality, Miller v. Alabama, — U.S.—, 132 S.Ct. 2455, 2463, 183 L.Ed.2d 407 (2012), and the second is a prohibition against specific torturous methods of punishment, Graham v. Florida, 560 U.S. 48, 59, 130 S.Ct. 2011, 176 L.Ed.2d 825 (2010). Broom’s challenge does not fit neatly into either category.
{¶ 37} In noncapital cases, the Eighth Amendment proportionality principle is narrow and “ ‘forbids only extreme sentences’ ” that are grossly disproportionate to the crime. Graham at 59-60, quoting Harmelin v. Michigan, 501 U.S. 957, 1001, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991) (Kennedy, J., concurring). In capital cases, proportionality analysis involves two subsets, “one considering the nature of the offense, the other considering the characteristics of the offender.” Id. at 60. With respect to the nature of the offense, proportionality in capital cases merely stands for the proposition that the punishment must fit the crime. See, e.g., Kennedy v. Louisiana, 554 U.S. 407, 128 S.Ct. 2641, 171 L.Ed.2d 525 (2008) (holding that an offender’s death sentence for the rape of a child who did not die is unconstitutionally disproportionate).
{¶ 38} As for the second category, the United States Supreme Court has held that the death penalty is unconstitutionally disproportionate when imposed upon individuals whose personal characteristics diminish their personal moral responsibility for the crimes they have committed. Roper v. Simmons, 543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005) (prohibiting the execution of juvenile offenders); Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002) (forbidding the execution of a defendant with intellectual disability). But Broom suggests no reason why his case might fall under this line of jurisprudence.
{¶ 39} With regard to the method of execution, the United States Supreme Court has long held that punishments are cruel “when they involve torture or a lingering death,” In re Kemmler, 136 U.S. 436, 447, 10 S.Ct. 930, 34 L.Ed. 519 (1890), or when they “‘involve-the unnecessary and wanton infliction of pain,”’ Rhodes v. Chapman, 452 U.S. 337, 346, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981), quoting Gregg v. Georgia, 428 U.S. 153, 173, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976). The United States Supreme Court has never struck down a specific execution method as cruel and unusual. Instead, the court has offered examples of execution methods that would constitute “torture or lingering death” as negative contrasts to a more humane method the court chose to affirm. For example, in affirming the constitutionality of execution by firing squad, the court contrasted the practice with live disemboweling, beheading, and quartering; with burning *70 alive; and with public dissection. Wilkerson v. Utah, 99 U.S. 130, 135, 25 L.Ed. 345 (1878); see also In re Kemmler at 446-447 (affirming the constitutionality of electrocution but stating that crucifixion and the breaking wheel would be cruel); Baze, 553 U.S. at 94-99, 128 S.Ct. 1520, 170 L.Ed.2d 420 (Thomas, J., concurring) (contrasting lethal injection with flaying, branding cheeks, dismemberment, cutting off hands or ears, and slitting nostrils).
{¶ 40} The foremost consideration, when analyzing a method of execution, is often the “objective evidence of the pain involved in the challenged method.” Campbell v. Wood, 18 F.3d 662, 682 (9th Cir.1994); accord Cooey, 589 F.3d at 223. But pain is not necessarily the only indicator of cruelty. The Eighth Amendment also demands that a penalty accord with “ ‘the dignity of man.’ ” Hope v. Pelzer, 536 U.S. 730, 738, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002), quoting Trop v. Dulles, 356 U.S. 86, 100, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958) (lead opinion).
{¶ 41} In its most recent method-of-execution case, the United States Supreme Court examined whether Oklahoma’s lethal-injection protocol violated the Eighth Amendment. The court followed the plurality opinion in Baze and noted that a prisoner’s challenge to a method of execution under the Eighth Amendment will fail unless the prisoner establishes that the method of execution presents a substantial risk of serious harm that is objectively intolerable and prevents prison officials from claiming that they were subjectively blameless. Glossip, — U.S. at—, 135 S.Ct. at 2737, 192 L.Ed.2d 761 (rejecting prisoners’ claim of Eighth Amendment violation because they failed to establish a substantial risk of harm and a known and available alternative). It is not enough that a prisoner shows that there is a slightly or marginally safer alternative. Instead, the prisoner must identify an alternative that is “ ‘feasible, readily implemented, and in fact significantly reduce[s] a substantial risk of severe pain.’ ” (Brackets sic.) Id., quoting Baze at 52.
{¶ 42} Broom’s actual sentence of death is not at issue, nor does this case concern Ohio’s chosen method of execution. Instead, Broom asserts that a second execution attempt would constitute cruel and unusual punishment. He claims that what he already experienced went beyond the time, pain, and emotional anguish involved in a “normal” execution. Because there is no guarantee of success, Broom contends, any further attempt to execute him would be cruel and unusual.
{¶ 43} Broom’s claim has no precedent in Ohio. The United States Supreme Court, however, considered whether a failed execution attempt violated the Eighth Amendment in Resweber. After the mechanical difficulty with the electric chair failed to result in Francis’s death, a new death warrant was issued. 329 U.S. at 460, 67 S.Ct. 374, 91 L.Ed. 422. Francis objected and argued that once he underwent “the psychological strain of preparation for electrocution,” to *71 require him to undergo the preparation a second time would subject him to lingering or cruel and unusual punishment. Id. at 464. A four-member plurality-rejected this argument, because “[t]he cruelty against which the Constitution protects a convicted man is cruelty inherent in the method of punishment, not the necessary suffering involved in any method employed to extinguish life humanely.” (Emphasis added.) Id. at 464.
{¶ 44} The dissenting justices noted that electrocution is statutorily and constitutionally permissible only if it is “so instantaneous and substantially painless that the punishment shall be reduced, as nearly as possible, to no more than that of death itself.” Id. at 474 (Burton, J., dissenting). The dissenters rejected the prospect of execution by installments, what they termed “a delayed process of execution.” Id. at 474-475.
{¶ 45} Justice Frankfurter cast the deciding vote. He joined the plurality to reject Francis’s appeal because he did not believe that the Fourteenth Amendment made the Bill of Rights applicable to the states.[1] According to Justice Frankfurter, the Due Process Clause of the Fourteenth Amendment limited a state’s criminal procedures only insofar as a state practice “ ‘offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.’ ” Id. at 469 (Frankfurter, J., concurring), quoting Snyder v. Massachusetts, 291 U.S. 97, 105, 54 S.Ct. 330, 78 L.Ed. 674 (1934). Justice Frankfurter did not believe that Louisiana’s treatment of Francis rose to that level. As a result, Willie Francis went to the electric chair a second time.
{¶ 46} Based on Resweber, we determine, as did the Eighth District, that there is no per se prohibition against a second execution attempt based on the Cruel and Unusual Punishments Clause of the Eighth Amendment. The state’s intention in carrying out the execution is not to cause unnecessary physical pain or psychological harm, and the pain and emotional trauma Broom already experienced do not equate with the type of torture prohibited by the Eighth Amendment.
{¶ 47} Having determined that allowing the state to go forward with Broom’s execution does not amount to a per se violation of the Eighth Amendment, we consider whether it is violated under the test set forth in Glossip and Baze. Broom argues that the state should have known of the potential problems with his execution beforehand. He submitted evidence that the state experienced problems establishing and maintaining IV catheters during the previous execu *72 tions of Joseph Clark and Christopher Newton and that problems should have been expected when Broom’s first vein assessment indicated that there may be trouble accessing the veins. But, it is unclear from the record why Broom’s execution team was unable to establish IV access. Although Dr. Heath suggested that it was poor technique, it is Broom’s burden to establish that he is likely to suffer severe pain if required to undergo a second execution.
{¶ 48} Further, in December 2009, less than three months after the attempt to execute Broom, the Sixth Circuit rejected a constitutional challenge to Ohio’s execution protocol, noting that “[speculations, or even proof, of medical negligence in the past or in the future are not sufficient to render a facially constitutionally sound protocol unconstitutional.” Cooey, 589 F.3d at 225. The protocol that the Sixth Circuit reviewed in Cooey has been amended and we cannot assume that the same problems with IV access will befall Broom again.
{¶ 49} Broom also contends that the state’s violation of the execution protocols indicates that prison officials were not blameless and created a substantial risk of harm. We agree that compliance with execution protocols is the best way to avoid the risk of severe pain, but deviation from a protocol is not an automatic constitutional violation. See In re Ohio Execution Protocol Litigation (Wiles), 868 F.Supp.2d 625, 626 (S.D.Ohio 2012) (protections of the United States Constitution “do not require perfect adherence to every single provision of Ohio’s execution protocol without deviation”). We are not convinced, however, that Broom has established that the state is likely to violate its execution protocol in the future.
{¶ 50} Following the events of September 15, 2009, the state was enjoined from carrying out the executions of Kenneth Smith and Charles Lorraine based in large part on the federal district court’s determination that Ohio was not following its execution protocol. See Cooey v. Kasich, 801 F.Supp.2d 623 (S.D.Ohio 2011); In re Ohio Execution Protocol Litigation (Lorraine), 840 F.Supp.2d 1044 (S.D.Ohio 2012).
{¶ 51} The state sought to address the concerns of the federal district court. It amended the protocol, adding a new command structure and forms that were required to be filled out as each step of the protocol was completed to ensure compliance. Wiles at 629-632. The state sufficiently demonstrated a commitment to follow the protocol and was allowed to proceed with the execution of Mark Wiles. Id. at 652. Several more executions occurred without any apparent violation of the protocol. In re Ohio Execution Protocol Litigation (Phillips), S.D.Ohio No. 2:11-cv-1016, 2013 WL 5963150, *11-16 (Nov. 7, 2013). This led the district court to conclude that “ ‘Ohio does not have a perfect execution system, but it has a constitutional system that it appears to be following.’ ” Id., *73 quoting In re Ohio Execution Protocol Litigation (Hartman), 906 F.Supp.2d 759, 791 (S.D.Ohio 2012).
{¶ 52} While we acknowledge that the state failed to follow the protocol in 2009, we cannot ignore what has transpired since then. The state has executed 21 death-row inmates since the attempted execution of Broom. See Ohio Department of Rehabilitation and Correction, Ohio Executions — 1999 to Present, http://www.drc.ohio.gov/web/executed/executed25.htm (last updated Jan. 16, 2014).
{¶ 53} To be clear, the state must comply with the protocol as amended. Strict compliance with the protocol will ensure that executions are carried out in a constitutional manner and can also prevent or reveal an inmate’s attempt to interfere with the execution process.[2] We simply are unable to conclude that Broom has established that the state in carrying out a second attempt is likely to violate its protocol and cause severe pain.
{¶ 54} We therefore conclude that the Eighth Amendment does not bar the state from carrying out Broom’s execution.
Article I, Section 9 of the Ohio Constitution
{¶ 55} Broom has also sought relief under the Ohio Constitution. Article I, Section 9 of the Ohio Constitution provides, “Excessive bail shall not be required; nor excessive fines imposed; nor cruel and unusual punishments inflicted.” This court has long held that the Ohio Constitution is a “document of independent force.” Arnold v. Cleveland, 67 Ohio St.3d 35, 616 N.E.2d 163 (1993), paragraph oné of the syllabus. The United States Constitution provides a floor for individual rights and civil liberties, but state constitutions are free to accord greater protections. Id. And recently, this court held for the first time that Article I, Section 9 provides protection “independent of’ the Eighth Amendment. In re C.P., 131 Ohio St.3d 513, 2012-Ohio-1446, 967 N.E.2d 729, ¶ 59. But we *74 have also noted that cases involving cruel and unusual punishments are rare, “limited to those involving sanctions which' under the circumstances would be considered shocking to any reasonable person.” McDougle v. Maxwell, 1 Ohio St.2d 68, 70, 203 N.E.2d 334 (1964).
{¶ 56} When the execution team was unable to establish IV lines, the attempt to execute Broom was halted. Because the lethal-injection drugs were never introduced into the IV lines, the execution was never commenced. The state also demonstrated in the executions that were conducted after September 2009 that it is committed to following the protocols as written. Because Broom’s life was never at risk since the drugs were not introduced, and because the state is committed to carrying out executions in a constitutional manner, we do not believe that it would shock the public’s conscience to allow the state to carry out Broom’s execution. We therefore conclude that Article I, Section 9 of the Ohio Constitution does not bar the state from executing Broom’s death sentence.
Conclusion
{¶ 57} The judgment of the Cuyahoga County Court of Appeals is affirmed.
Judgment affirmed.
O’Connor, C.J., and O’Donnell and Kennedy, JJ., concur.
French, J., dissents with an opinion in which Pfeifer, J., joins.
O’Neill, J., dissents with an opinion.

. The United States Supreme Court later repudiated Frankfurter’s position: The Due Process Clause of the Fourteenth Amendment does incorporate the Eighth Amendment’s protections against cruel and unusual punishments to apply to the states. Robinson v. California, 370 U.S. 660, 666-667, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962).

. At oral argument, the state speculated that Broom himself caused the difficulty in accessing his veins by taking antihistamines to dehydrate himself. There was also a reference in the official timeline of Broom’s execution that the “[m]edieal team [was] having [a] problem maintaining an open vein due to past drug use.” However, there is no evidence in the record supporting either allegation. We mention these allegations only to illustrate that following the current execution protocol could reveal potential problems with IV access. For instance, the protocol requires four vein checks and a review of the inmate’s medical chart, which may include information regarding prior drug use. Ohio Department of Rehabilitation and Correction, Policy No. 01-COM-ll, at 6, 9, 11, http://www.drc.ohio.gov/web/drc_policies/documents/01-COM-ll.pdf (accessed Jan. 25, 2016). Also, after transfer to the Death House, the inmate is to be constantly monitored by at least three members of the execution team who are required to maintain an execution timeline. Id. at 2 and 9. The execution timeline is supposed to record certain specified events, such as the vein cheeks and other information at the discretion of the execution team. Id. at 2. And certainly, the ingestion of antihistamines should be a noteworthy event.