[Cite as *State v. Sapp*, 2017-Ohio-1467.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
CLARK COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | C.A. CASE NO. 2015-CA-43 |
| | : | |
| v. | : | T.C. NO. 97-CR-177 |
| | : | |
| WILLIAM K. SAPP | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

**O P I N I O N**

Rendered on the ___21st___ day of _____April_____, 2017.

. . . . . . . . . .

MEGAN M. FARLEY, Atty. Reg. No. 0088515, Assistant Prosecuting Attorney, 50 E. Columbia Street, Suite 449, Springfield, Ohio 45502
    Attorney for Plaintiff-Appellee

MARSHALL G. LACHMAN, Atty. Reg. No. 0076791, 75 N. Pioneer Blvd., Springboro, Ohio 45066
    Attorney for Defendant-Appellant

. . . . . . . . . . . .

FROELICH, J.

{¶ 1} William K. Sapp appeals from a judgment of the Clark County Court of Common Pleas, which denied his petition for postconviction relief. For the following reasons, the judgment of the trial court will be affirmed.

{¶ 2} In 1999, Sapp was found guilty of nine counts of aggravated murder with

death penalty specifications, two counts of attempted aggravated murder, four counts each of rape by force and kidnapping, three counts of tampering with evidence, and three counts of abuse of a corpse. At the penalty phase of his trial, the jury found that the aggravating factors outweighed the mitigating circumstances, and it recommended the death penalty. After the merger of some counts, the trial court sentenced Sapp to death for three aggravated murders, to life imprisonment for two of the rapes, to 10- to 25-years on each of the other two rapes and the attempted aggravated murder, and to several additional prison terms, all to be served consecutively. On appeal, we affirmed his conviction and sentence in all respects. *State v. Sapp*, 2d Dist. Clark No. 99 CA 84, 2002-Ohio-6863. The Supreme Court of Ohio also affirmed his conviction and sentence. *State v. Sapp*, 105 Ohio St.3d 104, 2004-Ohio-7008, 822 N.E.2d 1239.

{¶ 3} On June 4, 2001, Sapp filed a petition for postconviction relief. The trial court denied this petition on January 10, 2002, and Sapp appealed. This court dismissed the appeal for lack of a final appealable order, because the trial court's decision did not include findings of fact and conclusions of law. *State v. Sapp*, 2d Dist. Clark No. 2002 CA 8, 2002-Ohio-3922.

{¶ 4} According to the trial court's next entry, which was filed on March 25, 2015, "a decision was drafted by [that] court providing detailed findings of fact and conclusions of law, however, it was recently discovered that the decision was never docketed and cannot not be located." Thus, on that date, the trial court provided findings of fact and conclusions of law, and it again denied the petition for postconviction relief.

{¶ 5} Sapp appeals, raising three assignments of error.

### I. Standard of Review

{¶ 6} An appellate court reviews a trial court's denial of a petition for post-conviction relief under an abuse-of-discretion standard. *State v. Gondor,* 112 Ohio St.3d 377, 2006-Ohio-6679, 860 N.E.2d 77, ¶ 58. An abuse of discretion implies an arbitrary, unreasonable, unconscionable attitude on the part of the trial court. *Blakemore v. Blakemore,* 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).

## II. Application of Res Judicata

{¶ 7} In his first assignment of error, Sapp claims that the trial court improperly applied the doctrine of res judicata in denying his petition, because he relied, in part, on evidence outside the record.

{¶ 8} We addressed the application of res judicata in postconviction proceedings in *State v. Goldwire,* 2d Dist. Montgomery No. 20838, 2005-Ohio-5784. We stated:

The most significant restriction on Ohio's statutory procedure for post-conviction relief is that the doctrine of res judicata requires that the claim presented in support of the petition represent error supported by evidence outside the record generated by the direct criminal proceedings. * * * Under the doctrine of res judicata, a final judgment of conviction bars the convicted defendant from raising and litigating in any proceeding, except an appeal from that judgment, any defense or any claimed lack of due process that was raised or could have been raised by the defendant at the trial which resulted in that judgment of conviction or on an appeal from that judgment. Our statutes do not contemplate relitigation of those claims in post conviction proceedings where there are no allegations to show that they

could not have been fully adjudicated by the judgment of conviction and an appeal therefrom. To overcome the res judicata bar, the petitioner must produce new evidence that renders the judgment void or voidable, and show that he could not have appealed the claim based upon information contained in the original record. Res judicata also implicitly bars a petitioner from "repackaging" evidence or issues which either were, or could have been, raised in the context of the petitioner's trial or direct appeal.

(Internal citations and quotations omitted.) *Id.* at ¶ 11; *State v. Eicholtz*, 2d Dist. Clark No. 2013 CA 100, 2014-Ohio-3837, ¶ 29.

**{¶ 9}** Sapp attached two affidavits to his petition, which he contends contain the evidence "outside the record" on which he sought to rely. The affidavits relate to an incident that occurred during the State's rebuttal closing argument during the guilt phase of the trial. Sapp was wearing a "stun belt" during the proceedings, and it unexpectedly shocked him. Sapp exclaimed in front of the jury, "What the f*** you doing, man?,"[1] apparently thinking that a deputy had shocked him deliberately when his behavior had not warranted it. The court immediately went into recess and instructed everyone in the courtroom to remain silent until the jury was escorted out. Spectators were also instructed to leave.

**{¶ 10}** An off-the-record discussion was had, and Sapp was escorted "downstairs" to have the mechanism checked. When Sapp returned to the courtroom, his attorney was allowed to make a statement. The attorney indicated that the "electrical belt" had

---

[1]Because our opinions are widely available online, we have chosen to insert asterisks into certain offensive words that appear in the transcript of this case and in other cases.

been removed and that Sapp "still wants to be in the courtroom with his shackles on." The parties then discussed what the jury should be told about the incident. The agreed-upon instructions included that the shock "was not done intentionally" and was "not occasioned by fault of any individual." The State then resumed its closing argument.

{¶ 11} The next day, after the jury had reached its verdicts but before the verdicts were announced, defense counsel asked for a mistrial based on Sapp's "yelling at the deputy" during argument the previous day. In response, the prosecutor noted that a curative instruction had been given, that there had been numerous security concerns throughout the trial which had justified the security measures that had been taken, and that "the Defendant himself had requested that he be shackled" prior to the incident with the belt. The trial court overruled the motion for a mistrial.

{¶ 12} Sapp attached two of his own affidavits to his petition for postconviction relief; the first is dated May 31, 2001, and the second is undated.

{¶ 13} In his first affidavit, Sapp stated that his "stun belt went off" in court and that he yelled, "What the f*** going on," because he "got a severe burn." Sapp further stated that the attorneys and judge had "a conference," but that the jurors "could hear and knew what was happening." He acknowledged that the judge had instructed the jury about the incident, but stated that it "did no good because they knew [he] was under this restraint," they saw him shackled at other times, and the jury was "upset and influenced by this."

{¶ 14} Sapp's second affidavit reiterated and embellished on some of the statements contained in the first affidavit. Additionally, Sapp stated that the incident involving the malfunction of the belt was

why I did <u>not</u> get on the stand in my behalf, and try to express my regrets. Why[?]   what good would it do or have done?   By this outburst from me do [sic] to the "Stun Belt" incident * * * the jury wouldn't have listened or believed anything I would have to say.   Even though my lawyers at this time during my closing arguments urged that I take the stand, <u>I couldn't.</u>   I even told them why, after what happened who would believe anything I had to say. * * * I knew I was convicted, anybody could have seen that in the courtroom and on the faces of the jurors that day.   (Emphasis sic.)

{¶ 15}   In response to this argument in Sapp's petition, the trial court made the following statements and findings:

* * * [A]s the court instructed the jury, no one was at fault in causing the disturbance, this court properly instructed the jury so as to refocus their attention on the evidence and away from the disturbance.   The disturbance was not prolonged and was not highly inflammatory, but, instead, consisted of a statement from the defendant to a deputy, and, in the court's exercise of its discretion, was properly cured by an instruction to disregard, as outlined above.

The defendant has submitted two affidavits in which he avers that the jury looked like they were impacted by this "outburst."   However, the defendant's own affidavit testimony is insufficient to support this claim. Due to a defendant's motivation to serve his own interests in a post-conviction proceeding, "conclusory or self-serving affidavits presented by the petitioner in support of his claims, without more, will not satisfy the

petitioner's evidentiary burden."  *State v. Pierce* (1998), 127 Ohio App.3d 578, 586.

The court also notes defendant's argument relates solely to matters that existed in the record at the time of the direct appeal.   Therefore, this claim both fails on the merits and is barred by res judicata.

**{¶ 16}**  The trial court correctly observed that the issue raised in Sapp's affidavits with regard to the accidental activation of the "stun belt" was apparent at the time of his direct appeal and was barred by res judicata.   It also reasonably concluded that Sapp's own affidavits were insufficient to support his claim that he was entitled to relief.   Some of the assertions in the affidavits, such as Sapp's statement that the jury was present and overheard the parties' discussion about what had happened, are directly refuted by the record.   The trial court did not abuse its discretion in concluding that Sapp's "new evidence" about the malfunction of the stun belt during trial did not entitle Sapp to postconviction relief.

**{¶ 17}** The first assignment of error is overruled.

### III.    Denial of Discovery

**{¶ 18}** In his second assignment of error, Sapp contends that the trial court's refusal to allow him to conduct discovery before it ruled on his postconviction relief petition violated his constitutional rights.   Specifically, he requested discovery regarding the jury's reaction to the unusual "stun belt" incident, into the grand jury proceedings, into the prosecutors' motives in charging him more harshly than others who were involved in some of the crimes, and with respect to the proportionality of his sentence, particularly by examining cases where life sentences were imposed. Sapp argues that the Civil Rules

provide for discovery in a civil case, such as this one.

{¶ 19} We have previously addressed this argument. In *State v. Kinley*, 136 Ohio App.3d 1, 21, 735 N.E.2d 921 (2d Dist.1999), we stated:

> Civ.R. 1(C) provides that the civil rules, "to the extent that they would by their nature be clearly inapplicable, shall not apply to procedure * * * in all other special statutory proceedings." Postconviction proceedings are special statutory proceedings, and R.C. 2953.21 makes no provision for the application of the Ohio Rules of Civil Procedure. Thus, we have held that the civil rules do not entitle a petitioner to discovery in postconviction proceedings. [Citations omitted.] The trial court was not required to allow Kinley to conduct extensive discovery in support of his petition.

The trial court relied on *Kinley* in overruling Sapp's requests for additional discovery.

{¶ 20} Sapp essentially contends that we should change our view on his right to discovery, without suggesting any basis for our doing so. He acknowledges that the Ohio Supreme Court has not addressed this issue. *See, e.g. State v. King*, 8th Dist. Cuyahoga Nos. 103947, 103948, and 103949, 2017-Ohio-181, ¶ 54 (Celebrezze, J., dissenting). If anything, the decision to grant or deny a request for discovery with respect to a petition for postconviction relief rests within the trial court's sound discretion. *State v. Broom,* 146 Ohio St.3d 60, 2016-Ohio-1028, 51 N.E.3d 620, ¶ 28. Here, as in *Broom*, the supporting affidavits, documentary evidence, and the trial record do not demonstrate "sufficient operative facts to establish substantive grounds for relief." *Broom* at ¶ 29, citing *State v. Calhoun,* 86 Ohio St.3d 279, 714 N.E.2d 905 (1999), at paragraph two of the syllabus. This is especially true in this case because many of Sapp's discovery

requests were only tangentially related, if at all, to his alleged grounds for postconviction relief and involved some matters that are not discoverable (e.g., questioning individual jurors for their reactions to the courtroom incident to impeach the verdict).

{¶ 21} Sapp cites a case from the Sixth Circuit Court of Appeals, *Keener v. Ridenour*, 594 F.2d 581 (6th Cir.1979), which discusses res judicata in relation to a federal habeas corpus petition and whether a petitioner who has previously filed a direct appeal must seek a delayed appeal as a prerequisite to seeking federal habeas corpus relief. *Id.* at 586. However, this holding did not take issue with or even mention the absence of a right to discovery in Ohio postconviction proceedings.

{¶ 22}    The second assignment of error is overruled.

### IV.    Development of Claim of "Mental Retardation"

{¶ 23} In his third assignment of error, Sapp contends that execution of the "mentally retarded" is unconstitutional and that "evolving standards of decency" require that he be allowed to conduct discovery to develop evidence in support of a claim on "mental retardation."

{¶ 24} First, we note that Sapp's petition sought discovery to "fully develop and continue to provide information on his mental illness"; it did not reference "mental retardation." However, in his reply to the State's memorandum in opposition, Sapp stated that he was attaching "a sealed document noted Exhibit 1." The reply described this document as "evidence dealing with Petitioner Sapp's previous mental health evaluations, noting the possibilities of mental retardation. There is also indication that it runs in the family."

{¶ 25} The record contains mental health records which appear to be marked

(somewhat illegibly) as Exhibit 1, although they are not sealed; we will assume, for the sake of argument, that these documents were properly submitted for consideration with Sapp's petition. The exhibit consists of 5 non-consecutive pages of a 17-page forensic evaluation conducted by Bobbie G. Hopes, Ph.D., and three non-consecutive pages of a 16-page letter to the court by Otto Kausch, M.D., detailing his psychiatric evaluation of Sapp. These documents obviously do not present a full picture of the doctors' conclusions. More importantly, these evaluations were conducted in 1996 and 1998 respectively; Sapp was convicted in 1999. Therefore, these evaluations were available to Sapp at the time of trial and did not constitute new evidence.

{¶ 26} Further, to the extent that the evaluators' conclusions can be gleaned from "Exhibit 1," they do not demonstrate that either evaluator believed Sapp was "mentally retarded." Hopes's report states that Sapp does not appear to be "mentally retarded," and that one psychological test placed him "within the Borderline range of intellectual ability (between 70 and 79; above Mild Mental Retardation and below Low Average)." Another psychological test indicated that Sapp's "tendency to endorse many symptoms produced an exaggerated pattern of scores commonly found among individuals who malinger or distort health problems. Consistent with research on feigning extreme symptoms, there is a strong possibility that his symptoms pattern is exaggerated in order for him to appear more disabled." Dr. Kausch observed that Sapp "seemed to be of average intelligence" during their interactions, that one of his teachers in grade school had described him as "extremely intelligent," and that tests performed when Sapp was in school had placed his IQ at 88-100. These documents did not support Sapp's argument that he should be allowed to conduct discovery related to his "mental retardation."

{¶ 27} The evidence during the mitigation phase of Sapp's trial showed that he was diagnosed with bipolar mood disorder, antisocial personality disorder, and borderline personality disorder. *Sapp,* 2d Dist. Clark No. 99 CA 84, 2002-Ohio-6863, at ¶ 130, ¶ 180. The doctor who testified to these diagnoses stated that she believed, to a reasonable degree of psychological certainty, that they impaired Sapp's ability to appreciate the meaning and consequences of his actions and to conform his behavior to the requirements of the law. (But we noted on appeal that her testimony on cross-examination contradicted this assertion.) *Id.* at ¶ 180, ¶ 185. The doctor also testified that there were indications that Sapp was "malingering" or faking his mental health issues, attempting to hide his preoccupation with killing women, and showing such exaggerated indications of mental illness as to indicate a "faked bad profile." *Id.* at ¶ 181. The doctor estimated Sapp's IQ at approximately 90, which is at the bottom of the average range. Sapp did not claim at trial that he was "mentally retarded," and the evidence did not support such a finding. In conducting our independent review of the death sentence, we found that Sapp had failed to prove by a preponderance of the evidence that, because of a mental disease or defect, he lacked substantial capacity to appreciate the criminality of his conduct and to conform his conduct to the requirements of the law. *Id.* at ¶ 185. The Ohio Supreme Court held likewise. *Sapp,* 105 Ohio St.3d 104, 2004-Ohio-7008, 822 N.E.2d 1239, at ¶ 124.

{¶ 28} In his reply, Sapp also relied on a case decided after his conviction, *Adkins v. Virginia,* 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), which held that the Eighth Amendment's prohibition on cruel and unusual punishment precludes the imposition of the death penalty on "mentally retarded criminals." The *Adkins* court was

unpersuaded that "the execution of mentally retarded criminals will measurably advance the deterrent or the retributive purpose of the death penalty." *Id.*, 536 U.S. at 321.

{¶ 29} In denying Sapp's petition, the trial court noted that the treatment of "mentally retarded" offenders under *Adkins* has not been extended to mentally ill offenders, citing *State v. Hancock*, 108 Ohio St.3d 57, 2006-Ohio-160, 840 N.E.2d 1032. The court also discussed evidence offered in the mitigation phase about Sapp's mental health. This evidence tended to show that 1) he was not experiencing a manic episode at the times of the crimes, as evidenced by his ability to clean up and to strategize with others about how to avoid detection; 2) during his psychological evaluations, Sapp had attempted to hide his preoccupation with killing women; 3) he told another inmate that he killed when he "got a taste for blood;" and 4) the killings were "shockingly violent" and showed "a profound disrespect for human life." Based on these factors, the trial court concluded that the justifications for the death penalty – retribution and deterrence – were well-served by sentencing Sapp to death.

{¶ 30} Additionally, the trial court found that Sapp's claim of "mental retardation" was barred by res judicata, because he did "not rely on any new evidence outside the record." This conclusion is supported by the fact that the evaluations contained in Exhibit 1 were performed prior to Sapp's trial and thus did not constitute "new evidence."

{¶ 31} Finally, the court also reaffirmed its prior statements that Sapp was not entitled to discovery in postconviction proceedings and noted that, if Sapp were claiming that his mental health had so deteriorated that he is now "insane," his redress would be through R.C. 2949.28, citing *State v. Scott,* 92 Ohio St.3d 1, 748 N.E.2d 11 (2001).

{¶ 32} The trial court did not abuse its discretion in concluding that Sapp was not

entitled to conduct discovery aimed at developing evidence of "mental retardation."

{¶ 33} The third assignment of error is overruled.

## V.    Conclusion

{¶ 34} The trial court did not abuse its discretion in denying Sapp's petition for postconviction relief.    The judgment of the trial court will be affirmed.

. . . . . . . . . . . . .

HALL, P.J. and TUCKER, J., concur.

Copies mailed to:

Megan M. Farley
Marshall G. Lachman
Hon. Richard J. O'Neill