RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 18a0022p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

IN RE: OHIO EXECUTION PROTOCOL LITIGATION.

_____

ALVA E. CAMPBELL, JR.; RAYMOND TIBBETTS,

　　　　　　　　　　　*Plaintiffs-Appellants*,

　　　*v.*

JOHN KASICH, et al.,

　　　　　　　　　　*Defendants-Appellees*.

No. 17-4221

_____

Appeal from the United States District Court
for the Southern District of Ohio at Columbus.
No. 2:11-cv-01016—Michael R. Merz, Magistrate Judge.

Argued: January 25, 2018

Decided and Filed: February 1, 2018

Before: BATCHELDER, ROGERS, and THAPAR, Circuit Judges.

_____

**COUNSEL**

**ARGUED:** Erin G. Barnhart, OFFICE OF THE FEDERAL PUBLIC DEFENDER FOR THE SOUTHERN DISTRICT OF OHIO, Columbus, Ohio, for Appellants. Peter T. Reed, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellees. **ON BRIEF:** Erin G. Barnhart, Allen L. Bohnert, David C. Stebbins, Adam M. Rusnak, Carol A. Wright, OFFICE OF THE FEDERAL PUBLIC DEFENDER FOR THE SOUTHERN DISTRICT OF OHIO, Columbus, Ohio, James A. King, PORTER, WRIGHT, MORRIS & ARTHUR LLP, Columbus, Ohio, for Appellants. Peter T. Reed, Eric E. Murphy, Michael J. Hendershot, Hannah C. Wilson, Jocelyn K. Lowe, Zoe A. Saadey, Charles L. Wille, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellees.

---

**OPINION**

---

ALICE M. BATCHELDER, Circuit Judge.   Two death-row inmates, Raymond Tibbetts and Alva Campbell, moved to enjoin their pending executions, claiming that Ohio's midazolam-based, three-drug execution protocol presents a constitutionally unacceptable risk of pain and suffering.   The district court considered the proffered evidence, determined that the inmates had not met their burden, and denied the requested injunctions.   We AFFIRM.

To obtain a preliminary injunction, a plaintiff must meet a four-factor test, *Glossip v. Gross*, 135 S. Ct. 2726, 2736-37 (2015), though the "likelihood of success on the merits" factor is determinative here.   The merits determination in this case is based on a two-part test in which Tibbetts and Campbell must first show that Ohio's execution protocol "presents a risk that is *sure or very likely* to cause serious pain and needless suffering."   *In re Ohio Execution Protocol (Fears v. Morgan)*, 860 F.3d 881, 886 (6th Cir. 2017) (en banc), *cert. denied*, 137 S. Ct. 2238 (2017) (quotation marks and citations omitted).   If they can satisfy that first part, they must also "prove that an alternative method of execution is available, feasible, and can be readily implemented, among other things."   *Id.* at 890 (citing *Glossip*, 135 S. Ct. at 2737 (quotation marks omitted)).   "[P]risoners cannot successfully challenge a State's method of execution merely by showing a slightly or marginally safer alternative[;] [they] must identify an alternative that is feasible, readily implemented, and in fact significantly reduces a substantial risk of severe pain."   *Glossip*, 135 S. Ct. at 2737 (quotation marks, editorial marks, and citation omitted)).

Because this appeal arises from the *Fears* remand, we can begin by recognizing that the *Fears* plaintiffs (which included Tibbetts but not Campbell) had "shown some risk that Ohio's execution protocol may cause some degree of pain, at least in some people," though *Fears* noted that "some risk of pain is inherent in any method of execution[,] no matter how humane[,] [a]nd the Constitution does not guarantee a pain-free execution."   *Fears,* 860 F.3d at 890 (quotation marks and citation omitted).   But in *Fears* we held that the plaintiffs had "fallen well short" of proving a risk that Ohio's execution protocol is *sure or very likely* to cause serious pain and

needless suffering and they, therefore, "failed to demonstrate a likelihood of success on their claims." *Id.* at 890, 892.

Facing this new motion after remand, the district court considered whether Tibbetts and Campbell had "added sufficient evidence" to reach the level of certainty of "sure or very likely," which the *Fears* plaintiffs had failed to meet. *See In re Ohio Execution Protocol ("Campbell")*, No. 2:11-CV-1016, 2017 WL 5020138, at *12 (S.D. Ohio Nov. 3, 2017). After carefully recounting their new evidence, the court concluded that they had not. The court also evaluated their proposed alternative method of execution and found that it was lacking. The court denied the motion.

In this appeal, Tibbetts and Campbell claim that the "serious pain and needless suffering" at issue in the *Fears* standard includes *psychological* pain and suffering, but that the district court "permit[ted] relief only in cases of severe *physical* pain" and "refused to consider the significant evidence of mental and psychological suffering." To be clear, in that part of its opinion the district court was considering psychological pain *unaccompanied by* physical pain, and explained:

> Psychological pain or mental suffering is a likely result of being sentenced to death and anticipating the execution, but that experience of psychological suffering could not by itself make a method of execution unconstitutional. Presumably all death row inmates suffer that pain, but the death penalty is not per se unconstitutional. Unless accompanied by serious physical pain, the mental suffering associated with being under a sentence of death is not material to the Eighth Amendment inquiry under *Baze* and *Glossip*.[1] It is not clear to this Court how a plaintiff could segregate anxiety from anticipated execution in general from anxiety about execution by a particular method. In any event, no evidence was offered to support a claim that either Campbell or Tibbetts suffers particular psychological pain associated with the Execution Protocol.

*Campbell*, 2017 WL 5020138, at *9 (citations omitted). We agree with this assessment and find that Tibbetts and Campbell do not actually contest it. Instead, they urge us to consider psychological pain *accompanied by* at least some physical pain, arguing that: "This suffering is *not* mere generalized anxiety in the face of impending death; it is the specific and acute suffering arising from the choking . . . attendant to the administration of Ohio's Execution Protocol [due]

---

[1]*Baze v. Rees*, 553 U.S. 35 (2008); *Glossip v. Gross*, 135 S. Ct. 2726 (2015).

to an inmate['s] [being] insufficiently rendered unconscious, unaware, and insensate to pain." So Tibbetts and Campbell are *not* urging us to consider some type of separate psychological pain. They urge us to consider *more* pain: physical *and* psychological.

Recall that Tibbetts and Campbell must prove that Ohio's protocol "presents a risk that is *sure or very likely* to cause serious pain and needless suffering." *Fears*, 860 F.3d at 886. More importantly, we accepted in *Fears* "that the protocol's second and third drugs . . . would cause severe pain to a person who is fully conscious," *id.* We did not hold, or even suggest, that there was a need to prove any *more* pain (or suffering); the physical pain alone was already serious enough. Rather, the "relevant question" was "whether the plaintiffs met their heavy burden to show that an inmate who receives a 500-milligram dose of midazolam is sure or very likely to be conscious enough to experience serious pain from the second and third drugs in the protocol." *Id.* (quotation marks and citations omitted). The relevant question now, as it was then, concerns the *likelihood* that the inmate is conscious enough to experience that serious pain, whether physical or psychological.

Tibbetts and Campbell's claim that the possible pain is far more (and more serious) than previously anticipated is immaterial, given that we had already accepted that the physical pain alone was sufficiently serious. That they anticipate more pain does not mean that they are "sure or very likely to be conscious," such that they would even feel that pain. The question that nevertheless remains is whether Tibbetts and Campbell "met their heavy burden to show that an inmate who receives a 500-milligram dose of midazolam is sure or very likely to be conscious enough," *Fears*, 860 F.3d at 886.

Tibbetts and Campbell contend that they can prove this level of certainty ("that an inmate who receives a 500-milligram dose of midazolam is sure or very likely to be conscious enough") by showing "uncertainty," and argue: "Of course, to show that a method is 'very likely' to *not* protect an inmate from pain, inmates could point to enough uncertainty as to midazolam's effectiveness to add up to that 'very likely' level of risk." If this were correct, it would mean that Ohio must produce enough proof of midazolam's effectiveness to overcome their assertions of uncertainty as to midazolam's effectiveness. That is, they would have us reverse the burden of proof set out in *Fears*, which we cannot do.

Regardless, Tibbetts and Campbell argue that they did, in fact, prove their claim and the district court was mistaken in finding that they did not. We review such findings of fact for clear error, by which we may reverse only if the evidence, taken from the entire record, produces a "definite and firm conviction" that the district court was mistaken. *Fears*, 860 F.3d at 896 (quotation marks and citation omitted). Even if we were to find an appellant's version of the facts more persuasive, we could not reverse under this standard, as it is expressly not enough that we "would have decided the case differently." *Id.* (quotation marks and citations omitted).

Tibbetts and Campbell's theory is that "if an inmate given only midazolam . . . can feel any pain, then they will feel all the pain from the second and third drugs, which are known to be excruciatingly painful and deeply psychologically traumatic." Relying on this theory, they argue that they proved three key facts: (1) that "midazolam[] is incapable of rendering an inmate impervious to this pain—or to ameliorate it or diminish it even slightly"; (2) that "even if midazolam could induce such a state, the haste with which Ohio administers the paralytic [second drug] . . . [makes it] impossible for midazolam to have reached full effectiveness before the painful second and third drugs are administered, regardless of the massive dose [of midazolam] that Ohio uses"; and (3) that the empirical evidence shows that inmates are feeling pain in spite of the midazolam, as proven by witness accounts of Gary Otte's struggle to breathe ("air hunger") and tears, and Torrey McNabb's body movements, such as raising his arm, contorting his face, and turning his head.

With regard to the third point, the district court did not agree that these involuntary bodily responses (i.e., air hunger, tears, and movement) necessarily proved that the inmates were feeling serious pain in spite of the midazolam. *Campbell*, 2017 WL 5020138, at *14-16. Note that, despite recognizing that these witness accounts were not beyond dispute[2] and were subject to some "observer bias," *id.* at *15, the court analyzed the claim on the premise that these bodily responses occurred as described, i.e., that Otte struggled to breathe and had tears, and that McNabb moved his arm and head. But the court did not agree with the meaning that Tibbets and Campbell attributed to these responses. Regarding Otte's struggle to breathe, the court found

---

[2]Ohio's "eyewitnesses differed in their observations of Mr. Otte's breathing," *id.* at *15, and "ODRC staff who were present saw one tear or maybe only a 'wetness' or 'moisture' at the corner of the left eye." *id.* at *16.

that "[t]hese observations were consistent with [testimony] . . . heard in January," *id.*, which *Fears*, 860 F.3d at 889-90, held to be insufficient to prove the claim.[3]  Similarly, the court found the testimony about McNabb's movements to be "essentially cumulative" of the testimony from the prior hearings and, therefore, insufficient pursuant to *Fears*.  And regarding Otte's tears, the court said:

> It is of course a commonplace of human experience that people cry when they are in physical pain, but they also cry for many other reasons.  Plaintiffs were careful to elicit testimony from eyewitnesses that they did not see Mr. Otte cry during his last statement, hymn, and prayer.  But there was no scientific evidence to tie the tear production to the experience of severe pain.

*Campbell*, 2017 WL 5020138, at *16.  While their experts "opine[d] that Mr. Otte would not have been tearing if he were under General Anesthesia," *id.*, "the Eighth Amendment does not require General Anesthesia before an execution," *id.* at *17; *Fears*, 860 F.3d at 890.

This leads back to Tibbetts and Campbell's first asserted fact—that midazolam does not protect against the serious pain of the second and third drugs.  This was already well-worn ground as we had rejected this claim based on the evidence produced in *Fears*, 860 F.3d at 887 (holding that evidence insufficient to show "that a 500-milligram dose of midazolam is very likely to leave an inmate conscious enough to feel serious pain"), and the Supreme Court had held that "the fact that a low dose of midazolam is not the *best* drug for maintaining unconsciousness during surgery says little about whether a 500-milligram dose of midazolam is *constitutionally adequate* for purposes of conducting an execution," *Glossip*, 135 S. Ct. at 2742.  The district court framed "the question now before [it] [a]s whether Campbell and Tibbetts have added sufficient evidence to the case to now show the Execution Protocol is sure or very likely to cause them severe pain and needless suffering."  *Campbell*, 2017 WL 5020138, at *12.

As mentioned, Tibbetts and Campbell's experts opined "that midazolam is not capable of producing General Anesthesia, [which is] defined as that state of human consciousness in which the subject is unconscious, unaware, and insensate to pain," meaning that an inmate given that

---

[3]The district court also addressed the fact that Otte's struggle to breathe may have been due to or affected by his morbid obesity, which would have warranted a medical accommodation if it had been requested.  Such an accommodation (a wedge-shaped pillow to elevate the body) has been offered to Campbell, thereby disproving any claim that Ohio's protocol includes a prohibition on or refusal to make reasonable accommodations.

drug is not completely insensate to pain. *Id.* But, as the court explained later, "the fact that [an inmate] was not insensate to pain does not prove he was experiencing pain or what level of pain he was experiencing." *Id.* at *16. More importantly, "General Anesthesia, particularly in the sense of rendering a subject completely insensate to pain, is not constitutionally required." *Id.* at *18. These experts offered no new evidence to overcome the prior rejections of this approach.

Tibbetts and Campbell's expert pharmacologist testified that midazolam has no analgesic (painkilling) properties. *Id.* at *17. But this expert acknowledged that his opinion disagreed with that of the State's expert and "also acknowledged on cross-examination that there are no clinical studies of the effects of midazolam in doses anywhere near the 500 mg Ohio uses; that dose is so far above any clinical dose ever used that experimentation with such doses would be unethical." *Id*. at *12. The court found the evidence insufficient to support the contention:

> [T]he dose of midazolam in use here, a multiple of the highest recommended clinical dose, appears to be sufficient to suppress consciousness to the extent that an inmate will not respond to the consciousness checks used by emergency medical technicians and used by Ohio, most recently on Mr. Otte. There is literature to which [the expert pharmacologist] testified that shows a rank ordering of responses to such consciousness checks (i.e., some will elicit responses that others would not elicit). Ultimately, however, the presented science does not prove conclusively the inference Plaintiffs' experts drew that it was certain or very likely Mr. Otte experienced serious or severe pain.

*Id*. at *17 (footnote omitted). To summarize: because Tibbetts and Campbell could produce no scientific evidence about the unseen effects of a 500-mg dose of midazolam, they could only speculate but could not prove that its use is *sure or very likely* to fail to prevent serious pain, and hence, they could not prove that its use presents a risk that the protocol as a whole is *sure or very likely* to cause serious pain.

Finally, Tibbetts and Campbell insist that even if the 500-mg dose of midazolam would render the inmate insensate to serious pain, Ohio administers the painful second drug before the midazolam has sufficient time to take effect. The court explained that, while the scientific documentation reports that midazolam takes effect within minutes, regardless of dose, *id*. at *13, the Ohio protocol does not operate on strict time frame; it operates on "consciousness checks." The court then cited four prior iterations of this case in which it had rejected plaintiffs' claims that the consciousness checks were inadequate, and repeated that "attempting to regulate those

checks would involve the Court in micromanagement of the execution process." *Id.* at \*18. We agree with this determination and find that, as with the prior claim, Tibbets and Campbell's inability to produce scientific evidence about the unseen effects of a 500-mg dose of midazolam leave them unable to prove that the execution protocol as a whole is *sure or very likely* to cause serious pain.

Tibbetts and Campbell have not shown that the district court's findings were mistaken, let alone proven that the district court committed clear error in deciding that they had failed to satisfy the first part of the test.

Even if Tibbetts and Campbell could prevail on the first part of the test by proving the risk of serious pain and needless suffering, they must still satisfy the second part, which is to identify an available, feasible, and readily implemented alternative that will significantly reduce that risk. *Glossip*, 135 S. Ct. at 2737; *Fears*, 860 F.3d at 890. Tibbetts and Campbell proposed a two-part alternative that would involve (1) omitting the paralytic second drug and (2) using additional medical monitoring—blood pressure, heart rate, EKG, EEG, and bispectral index (BIS) measurements—to determine, before administering potassium chloride, the painful third drug, whether the midazolam had rendered the inmate sufficiently insensate to serious pain.

Fatal to this alternative is that it contradicts their argument with respect to the first part of the *Glossip* and *Fears* test. This proposed alternative would be viable only if, in fact, midazolam actually protects the inmate from feeling the serious pain caused by the potassium chloride. More to the point, this alternative would be viable only if Tibbetts and Campbell are wrong about their claims that midazolam does not work. If midazolam works, then this is just an example of "a slightly or marginally safer alternative" the Court expressly denounced in *Glossip,* 135 S. Ct. at 2737.

But if Tibbetts and Campbell were correct that midazolam would not protect them from feeling serious pain—as would have been necessary for them to prevail on the first part of the test—then this "alternative" method of execution would do nothing to reduce the risk of serious pain and needless suffering that was established in the first part, but would instead ensure it. This led the district court to comment that "[i]t is difficult to credit this proposal as being in good

faith." *Campbell*, 2017 WL 5020138, at *23. As the State points out in its brief, this is not actually an "alternative method of execution," it is an additional harness on the current method.

Beyond this conceptual problem with this proposal, the district court actually rejected it because Tibbetts and Campbell had failed to support it, explaining, for example, that:

> The Court had expected a good deal more testimony on the use of monitoring devices and particularly on interpretation of their output by persons not members of the medical professions. Although [their experts] testified about the standard, indeed professionally required, use of such devices in a clinical setting, neither testified that the results of using those devices could be readily interpreted by an EMT or anyone else not prohibited ethically from participating in executions.

*Id*. at *22 (footnote omitted). Tibbetts and Campbell argue here, with some citation to select testimony, that the proposed monitoring devices are not difficult to use, that even a person with no medical experience could be taught easily to operate and read them, and that they often involve little more than reading a number from a display.

But Tibbetts and Campbell have not produced evidence to show, at a minimum, that non-medical personnel could necessarily be trained to: interpret and apply the cumulative readings from all of those devices, including inconsistent or contradictory readings; troubleshoot or adjust for varying conditions or circumstances; apply the readings in the execution setting; or determine from all of this that the inmate is sufficiently unconscious that he would not feel serious pain or needless suffering, even if he would feel some (constitutionally acceptable) pain.

Tibbets and Campbell bore the burden of proof on this issue and they have produced nothing on appeal to convince us that that the district court was mistaken, let alone prove to us that the district court committed clear error in deciding that they failed to satisfy this second part of the test.

For all of the foregoing reasons, we AFFIRM the judgment of the district court.