RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 20a0188p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

ROMELL BROOM,

　　　　　　　　　*Petitioner-Appellant*,

　　　*v.*

TIM SHOOP, Warden,

　　　　　　　　　*Respondent-Appellee*.

┐
│
│
│
│ > No. 19-3356
│
│
│
┘

─────────────────

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 1:10-cv-02058—Christopher A. Boyko, District Judge.

Argued: April 7, 2020

Decided and Filed: June 23, 2020

Before: BATCHELDER, MOORE, and GIBBONS, Circuit Judges.

─────────────────

## COUNSEL

**ARGUED:** Timothy F. Sweeney, LAW OFFICE OF TIMOTHY FARRELL SWEENEY, Cleveland, Ohio, for Appellant. Charles L. Wille, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellee. **ON BRIEF:** Timothy F. Sweeney, LAW OFFICE OF TIMOTHY FARRELL SWEENEY, Cleveland, Ohio, S. Adele Shank, LAW OFFICE OF S. ADELE SHANK, Columbus, Ohio, for Appellant. Charles L. Wille, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellee.

─────────────────

## OPINION

─────────────────

KAREN NELSON MOORE, Circuit Judge. In an infamous September 2009 incident, the state of Ohio tried to execute death-row inmate Rommel Broom, and failed. More

specifically, the state tried to execute Broom by way of lethal injection, but was forced to abandon the effort when the execution team concluded—two hours into the process—that it could not maintain a viable IV connection to Broom's veins. The state then returned Broom to his cell, to await a second execution attempt on another day. That second execution attempt has not yet happened, however, because the parties have spent the last eleven years litigating whether the U.S. Constitution bars Ohio from *ever* trying to execute Broom again—Broom relies on both the Eighth Amendment's prohibition on "cruel and unusual" punishment and the Fifth Amendment's prohibition on "double jeopardy." The state courts, including the Ohio Supreme Court, have rejected Broom's contentions on the merits, as did the district court below on habeas review. Broom's case now comes before us.

We in no way condone Ohio's treatment of Broom; that it took *two hours* of stabbing and prodding for the state to realize that it could not maintain a viable IV connection to Broom's veins is disturbing, to say the least. But because the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") permits us to reverse state court merits decisions in only a narrow set of circumstances, and because the Ohio Supreme Court's decision rejecting Broom's constitutional claims on the merits does not fall within that set of circumstances here, we **AFFIRM** the district court's judgment denying Broom habeas relief.

## I. BACKGROUND

Ohio's lethal injection protocol has been the subject of federal litigation for over a decade. *See generally In re Ohio Execution Protocol (Fears)*, 860 F.3d 881 (6th Cir. 2017) (en banc); *Cooey v. Strickland (Biros)*, 589 F.3d 210 (6th Cir. 2009); *In re Ohio Execution Protocol Litig. (Hartman)*, 906 F. Supp. 2d 759 (S.D. Ohio 2012). Most of this litigation has consisted of death-row inmates bringing lawsuits pursuant to 42 U.S.C. § 1983, alleging that Ohio's protocol is unconstitutional because it risks causing them unnecessarily severe pain during the final minutes of their lives and because more humane alternatives to Ohio's protocol exist. *See* U.S. Const., amend. VIII (prohibiting the "inflict[ion]" of "cruel and unusual punishment[]"); *Glossip v. Gross*, 135 S. Ct. 2726 (2015) (setting forth relevant legal standard); *Baze v. Rees*, 553 U.S. 35 (2008). Although Ohio has repeatedly modified its protocol in response to this litigation—such as by changing the drugs used in its lethal injection "cocktail" and by increasing oversight of its

execution team—the courts have by and large affirmed the constitutionality of Ohio's system at every turn (over the dissent of some members of this court, *see, e.g.*, *In re Ohio Execution Protocol (Fears)*, 860 F.3d at 892–909 (Moore, J., dissenting)).

Romell Broom's case is different. Unlike the typical death-row inmate, Broom is not challenging the state's lethal injection protocol writ large (at least in this proceeding). Rather, Broom makes the novel argument that his forthcoming execution is unconstitutional because Ohio has already tried—and failed—to execute him once before. The facts of that failed execution are described by the Ohio Supreme Court as follows:

> Broom was transported to the Southern Ohio Correctional Facility ("Lucasville") on September 14, 2009, in anticipation of his execution scheduled for the next day. Upon his arrival at Lucasville, a nurse and a phlebotomist conducted a vein assessment and found that Broom's right-arm vein appeared accessible, but his left-arm vein seemed less so. Prison officials communicated this information to Edwin C. Voorhies Jr., the regional director for the Office of Prisons of the Ohio Department of Rehabilitation and Correction ("ODRC"), and the medical team assured him that this would not present a problem.

> At 1:59 p.m. on September 15, the warden finished reading the death warrant to Broom. One minute later, Team Members 9 (a female) and 21 (a male) entered the holding cell to prepare the catheter sites.

> Team Member 9 made three attempts to insert a catheter into Broom's left arm but was unable to access a vein. At the same time, Team Member 21 made three unsuccessful stabs into Broom's right arm. After a short break, Member 9 made two more insertions, the second of which caused Broom to scream aloud from the pain.

> Member 21 managed to insert the IV catheter into a vein, but then he lost the vein and blood began running down Broom's arm. When that occurred, Member 9 rushed out of the room, saying "no" when a security officer asked if she was okay.

> Director Voorhies testified that he could tell there was a problem in the first 10 to 15 minutes. Warden Phillip Kerns saw the team make six or seven attempts on Broom's veins during the same 10–to–15–minute period. According to Kerns, the team members did hit veins, but as soon as they started the saline drip, the vein would bulge, making it unusable.

> About 15 minutes into the process, Kerns and Voorhies saw Member 9 leave the holding cell. Voorhies described her as sweating "profusely" and heard her say

that she and Member 21 had both accessed veins, but the veins "blew." Member 17 then entered the holding cell and made "several attempts" to access a vein in Broom's left arm. Simultaneously, Member 21 continued his attempts on Broom's right arm.

Terry Collins, who was then the director of the ODRC, called a break about 45 minutes into the process to consult with the medical team. The break lasted 20 to 25 minutes. The medical team reported that they were gaining IV access but could not sustain it when they tried to run saline through the line. They expressed "clear concern" about whether they would get usable veins. But because they said that there was a reasonable chance of establishing venous access, the decision was made to continue.

By this time, Broom was in a great deal of pain from the puncture wounds, which made it difficult for him to move or stretch his arms. The second session commenced with three medical team members—9, 17, and 21—examining Broom's arms and hands for possible injection sites. For the first time, they also began examining areas around and above his elbow as well as his legs. They also reused previous insertion sites, and as they continued inserting catheter needles into already swollen and bruised sites, Broom covered his eyes and began to cry from the pain. Director Voorhies remarked that he had never before seen an inmate cry during the process of venous access.

After another ten minutes or so, Warden Kerns asked a nurse to contact the Lucasville physician to see if she would assess Broom's veins and offer advice about finding a suitable vein. Broom later stated that he saw "an Asian woman," whom he erroneously identified as "the head nurse," enter the chamber. Someone handed her a needle, and when she inserted it, she struck bone, and Broom screamed from the pain. At the same time, another team member was attempting to access a vein in Broom's right ankle.

The Lucasville physician confirmed that she came to Broom's cell, examined his foot, and made one unsuccessful attempt to insert a needle but quickly concluded that the effort would not work. By doing so, she disobeyed the warden's express instructions to observe only and not get involved. The physician examined Broom's foot but could see no other vein.

After the physician departed, the medical team continued trying to establish an IV line for another five to ten minutes. In all, the second session lasted approximately 35 to 40 minutes.

During the second break, the medical team advised that even if they successfully accessed a vein, they were not confident that the site would remain viable throughout the execution process. The governor's office had signaled its willingness to grant a reprieve, and so the decision was made to halt the execution for the day.

Dr. Jonathan Groner examined and photographed Broom three or four days afterward. The photographs show 18 injection sites: one on each bicep, four on his left antecupital (forearm), three on his right antecupital, three on his left wrist, one on the back of his left hand, three on the back of his right hand, and one on each ankle. Prison officials later confirmed that he was stuck at least 18 times.

Dr. Mark Heath met with Broom one week after the event. Dr. Heath observed "considerable bruising" and a lot of "deep and superficial" tissue damage consistent with multiple probing. Dr. Heath also posited that the actual number of catheter insertions was much higher than the number of needle marks, because according to what Broom told him, the medical team would withdraw the catheter partway and then reinsert it at a different angle, a procedure known as "fishing."

*State v. Broom*, 51 N.E.3d 620, 623–25 (Ohio 2016).

Shortly after this failed execution attempt Broom filed a Section 1983 lawsuit in federal court, claiming that any attempt to execute him again would violate either the Eighth Amendment's prohibition on cruel and unusual punishments or the Fifth Amendment's bar on "double jeopardy." *See* U.S. Const., amend. V ("[N]or shall any person be subject for the same offence to be twice put in jeopardy of life or limb[.]"). The district court dismissed most of Broom's suit without prejudice, reasoning that, because Broom sought to prevent Ohio from executing him *at all* (as opposed to from executing him in a certain *manner*), his claims were best classified as a habeas challenge to "the fact[] of [his] sentence itself." *Broom v. Strickland*, 2010 WL 3447741, at *3–4 (S.D. Ohio Aug. 27, 2010); *see also In re Campbell*, 874 F.3d 454, 462 (6th Cir. 2017) (holding that a "death-penalty challenge is . . . cognizable in habeas" only if it alleges "a defect [that] impairs the very fact of the death sentence itself"). Consequently, Broom filed a placeholder habeas suit in federal court, *see Broom v. Bobby*, 2010 WL 4806820 (N.D. Ohio Nov. 18, 2010), and then proceeded to litigate his "no second execution" Eighth Amendment and Fifth Amendment claims in Ohio state court, *see* 28 U.S.C. § 2254(b)(1)(A) (requiring state prisoners to exhaust state-court remedies before bringing a federal habeas claim).

In the state trial court, Broom argued that Ohio's conduct during the failed execution attempt was reckless at best, malicious at worst. And as evidence of this contention, Broom pointed both to eyewitness testimony recounting the state's prolonged and painful effort to execute him (which we set forth above), and to expert testimony stating, among other things, that the execution team failed to abide by its own protocols and that Broom's veins "should have

been easily accessed." *Cooey v. Strickland (Biros)*, 2009 WL 4842393, at *70 (S.D. Ohio Dec. 7, 2009), *aff'd*, 589 F.3d 210 (6th Cir. 2009).[1] Therefore, Broom reasoned, his first execution attempt was analogous to purposeful torture, and it would be cruel and unusual to allow the state to subject him to its lethal injection protocol again. The state trial court, however, rejected Broom's arguments, and denied Broom's request for an additional evidentiary hearing. Although the trial court acknowledged "that repeated needle sticks are indeed unpleasant," it concluded ultimately that such "needle sticks" "are not torture when performed to establish IV lines and the procedure is not such that a substantial risk of serious harm is present, especially where, as here, the procedure [was] halted out of an abundance of caution prior to the administration of any substance (including saline)." R. 19-3 (Tr. Court Order) (Page ID #1319). The Ohio Court of Appeals affirmed. *See State v. Broom*, 2012 WL 504504 (Ohio Ct. App. Feb. 16, 2012).

Broom's case then went to the Ohio Supreme Court. In a 4–3 decision, the court held that neither the Eighth Amendment nor the Fifth Amendment barred a second execution attempt. As for Broom's Eighth Amendment claim, the majority first analyzed the Supreme Court decision *Louisiana ex rel. Francis v. Resweber*, 329 U.S. 459 (1947)—in which the Supreme Court upheld the constitutionality of a second execution attempt, in the context of a failed electrocution—and then concluded that, "[b]ased on *Resweber*," a second execution attempt would not violate the Eighth Amendment here because Ohio's "intention in carrying out the execution is not to cause unnecessary physical pain or psychological harm, and the pain and emotional trauma Broom already experienced do not equate with the type of torture prohibited by the Eighth Amendment." *Broom*, 51 N.E.3d at 631. The majority also held that, because

---

[1]This testimony came from a hearing U.S. District Judge Gregory Frost conducted on the constitutionality of Ohio's lethal injection protocol in December 2009. Although Broom was not a direct participant in this hearing, his failed execution was the primary subject at hand. This was because other death-row inmates seized on Ohio's inept treatment of Broom to argue that Ohio's protocol subjected them (the inmates with pending executions) to an unconstitutionally high risk of pain. As a result, those inmates' lawyers spent a substantial amount of time gathering information about Broom's execution, including soliciting testimony from medical experts. Although this constitutional argument ultimately proved unavailing, *see, e.g.*, *Cooey*, 589 F.3d at 228 (allowing a post-Broom execution to proceed, despite the "unfortunate" Broom "incident," because, although Ohio's protocol "is regrettably open to the possibility of mistaken application," "[w]hen administered properly," it is "humane and constitutional"), the evidence collected at this December 2009 hearing still constitutes the best and most thorough accounting of Broom's first attempted execution.

Ohio had revamped its lethal injection protocol since Broom's failed execution and because the state had conducted over 20 executions under those revamped protocols (with the federal courts' approval), Broom had not established that the state was likely to repeat its past errors. *Id*. at 631–32 (citing Ohio's public execution database and *In re Ohio Execution Protocol Litig. (Wiles)*, 868 F. Supp. 2d 625, 629–32 (S.D. Ohio 2012)). As for Broom's Fifth Amendment claim, the majority reasoned that, because the state's first execution attempt "did not proceed to the point of injection of a lethal drug into the IV line, jeopardy never attached," and, as a result, a second execution attempt did not implicate "the Fifth Amendment protection against double jeopardy." *Id*. at 627.

Three justices dissented. In the principal dissent, Justices French and Pfeifer argued that, because there was "an unresolved dispute of fact at the heart of the case, namely, the reason for the state's inability to establish IV access at the start of Broom's attempted execution," Ohio law entitled Broom to at least an evidentiary hearing. *Id*. at 634 (French, J., dissenting). "If the state cannot explain why the Broom execution went wrong," the dissent reasoned, "then the state cannot guarantee that the outcome will be different next time." *Id*. at 637. The justices did not, however, take a position on the merits of either of Broom's constitutional claims.

Justice O'Neill also dissented. And, in his dissent, he contended that a second execution attempt would violate the Eighth Amendment—full stop—in large part because, in his view, standards of decency have "evolved substantially" since the Supreme Court's decision in *Resweber*. *See id*. at 639–40 (O'Neill, J., dissenting) (describing the state's initial execution attempt as "torture"). Justice O'Neill did not address Broom's Fifth Amendment claim.

His state remedies exhausted, Broom resumed litigating his (still-pending) habeas petition in federal court. After first rejecting Broom's request for permission to conduct additional discovery—a decision that is not on appeal here—the district court determined, in a thoughtful and thorough 71-page order, that Broom's Eighth Amendment and Fifth Amendment claims could not proceed. Guided by the demanding standards imposed on federal habeas review by the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), the district court reasoned that, although "[f]ew would disagree that Ohio's failed attempt to execute Broom was a deeply unfortunate incident," given the exceedingly limited on-point Supreme Court

precedent, "Broom ha[d] not demonstrated that the [Ohio Supreme Court] was objectively unreasonable in deciding that the pain and trauma he endured as a result of the State's initial execution attempt and the psychological pain he may experience in a second attempt do not rise to the level of an Eighth Amendment violation." *Broom v. Jenkins*, 2019 WL 1299846, at *31 (N.D. Ohio Mar. 21, 2019); *see also id.* at *34 (similar conclusion with respect to Broom's Fifth Amendment claim).

This appeal followed.

## II. DISCUSSION

When a habeas petitioner raises a claim that has already been adjudicated on the merits by a state court, AEDPA requires federal courts to defer to the state court's decision unless the court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). AEDPA deference is a "difficult" bar to overcome, requiring the petitioner to "show that the state court's ruling on [his] claim . . . was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 102–03 (2011). Deference to the state court is particularly warranted, moreover, when the governing Supreme Court precedent is itself unclear or ambiguous. *See, e.g.*, *Wright v. Van Patten*, 552 U.S. 120, 126 (2008) (per curiam) ("Because our cases give no clear answer to the question presented, let alone one in [the petitioner's] favor, it cannot be said that the state court unreasonably applied clearly established Federal law." (citations omitted)); *Mitchell v. Esparza*, 540 U.S. 12, 17 (2003) (per curiam) ("A federal court may not overrule a state court for simply holding a view different from its own, when the precedent from this Court is, at best, ambiguous.").

## A.

At the outset, the parties dispute a threshold matter. Was the Ohio Supreme Court's ruling "on the merits," such that it is entitled to deference under § 2254(d)(1)? We think it was.

*Harrington v. Richter* teaches that, "[w]hen a federal claim has been presented to a state court and the state court has denied relief, it may be *presumed* that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." 562 U.S. at 99 (emphasis added). This is a "strong" presumption "that may be rebutted only in unusual circumstances," such as when a state court rejects a federal claim because "of sheer inadvertence," without "evaluat[ing] . . . the intrinsic right and wrong of the matter." *Johnson v. Williams*, 568 U.S. 289, 302–03 (2013).

Regardless of what one thinks of the Ohio Supreme Court's decision, there is no doubt that the court in fact adjudicated Broom's Eighth Amendment and Fifth Amendment claims on the merits, by "evaluat[ing] . . . the intrinsic right and wrong of the matter[s]." *Id*. And although Broom points out, correctly, that the court leaned on extra-record evidence at one point in its decision, *see Broom*, 51 N.E.3d at 632 (citing Ohio's online public execution database as proof that "[t]he state has executed 21 death-row inmates since the attempted execution of Broom"), there is no reason to think that this citation rendered the court's decision "non-merits" for purposes of AEDPA review. This is especially so because the extra-record citation was to a governmental website. *See, e.g.*, *United States v. Garcia*, 855 F.3d 615, 621 (4th Cir. 2017) ("This court and numerous others routinely take judicial notice of information contained on state and federal government websites."). Similarly, there is no reason to think that the court's decision became "non-merits" simply because new factual developments occurred after the court issued its decision in March 2016. *See* Appellant Reply Br. at 11 (arguing, without citation to precedent, that the Ohio Supreme Court's decision was not "on the merits" because, in October 2016, Ohio changed the drugs used in its lethal injection protocol). And there is likewise no force to Broom's contention that "judgment on a materially incomplete record is not an adjudication [on the merits]," Appellant Br. at 40 (quoting *Winston v. Kelly*, 592 F.3d 535, 555 (4th Cir. 2010)), because this court has twice rejected the strain of case law cited by Broom, describing it as incompatible with the Supreme Court's decisions in *Harrington* and *Cullen v. Pinholster*, 563 U.S. 170 (2011). *See Loza v. Mitchell*, 766 F.3d 466, 494–95 (6th Cir. 2014); *Ballinger v. Prelesnik*, 709 F.3d 558, 561–62 (6th Cir. 2013).

**B.**

With this threshold question resolved, we now turn to the parties' chief dispute: whether the Ohio Supreme Court unreasonably applied "clearly established" Supreme Court precedent when it ruled that Ohio could attempt to execute Broom a second time without running afoul of the Eighth Amendment's bar on "cruel and unusual" punishments.

For starters, we first clarify what the clearly established Supreme Court precedent governing Broom's claim is, exactly. Ohio argues that *Lousiana ex rel. Francis v. Resweber*, 329 U.S. 459 (1947), is the only such precedent, because it is the only Supreme Court precedent dealing with a factual scenario even remotely analogous to the one presented here, *i.e.*, the constitutionality of a second execution attempt. Broom, by contrast, argues that a later Supreme Court decision, *Trop v. Dulles*, 356 U.S. 86 (1958), is the most on-point precedent because, although *Trop*'s facts are nothing like the facts here—*Trop* concerned the constitutionality of using denationalization as a punishment—that decision established the important principle that the Eighth Amendment "must draw its meaning from the evolving standards of decency that mark the progress of a maturing society," *id*. at 101 (plurality opinion).

Ohio is right. For a Supreme Court precedent to be "clearly established" the decision's holdings must "squarely address[] the issue in [the] case," *Wright*, 552 U.S. at 125; "abstract" constitutional principles, or dicta more broadly, do not suffice, *see Lopez v. Smith*, 574 U.S. 1, 6 (2014) (per curiam) (reversing circuit court for holding that certain Supreme Court decisions provided "clearly established" law when the cited decisions did not "address[], even remotely, the *specific* question presented by [the] case" (emphasis added)); *White v. Woodall*, 572 U.S. 415, 419 (2014) (noting that "clearly established Federal law . . . includes only the holdings, as opposed to the dicta, of this Court's decisions" (citations omitted)). Because *Resweber* is the only Supreme Court precedent to address the issue presented by this case—the constitutionality of a second execution attempt after a botched first attempt—it was the only Supreme Court precedent capable of providing a clear Eighth Amendment holding for the Ohio Supreme Court to follow. And although Broom suggests that *Trop*, and its progeny, have implicitly overruled *Resweber*, *see* Appellant Br. at 47 (describing the *Resweber* court's "understanding of the impact of trauma" as "no longer valid"), not only does this argument actually undermine Broom's

point—if *Resweber* is no longer good law that just means there is no clearly established law in this realm *at all*—but also the Supreme Court's continued citation of *Resweber* shows that the Court still views the decision as binding. *See, e.g.*, *Glossip*, 135 S. Ct. at 2732, 2739; *Baze*, 553 U.S. at 50.

With this issue clarified, our inquiry becomes twofold:  First, what did *Resweber* hold, as a matter of Eighth Amendment law?  And, second, did the Ohio Supreme Court unreasonably apply that holding when it denied Broom's Eighth Amendment claim?

**1.**

*Resweber*'s facts are straightforward.  In 1945, a Louisiana jury convicted a young African-American man named Willie Francis of murder and sentenced him to death.**²** Consequently, on May 3, 1946, the state's execution team read Francis his last rites and strapped him into the electric chair.  Similar to the case at hand, however, when "[t]he executioner threw the switch . . . death did not result"; this was "presumably because of some mechanical difficulty." *Resweber*, 329 U.S. at 460.  Francis was then "removed from the chair and returned to prison." *Id.*  The question thus became whether the Constitution permitted Louisiana to attempt to execute Francis by electric chair again, despite the fact that the state had not only put Francis "through the difficult preparation for execution," to no avail, but had also sent "through [Francis's] body a current of electricity intended to cause death," also to no avail. *Id.* at 461.

The Court said yes, the Constitution did not prohibit Louisiana from attempting to execute Francis a second time.  Its opinion, however, was a fractured one.

*The plurality opinion.*  Justice Reed—writing for himself, Chief Justice Vinson, Justice Black, and Justice Jackson—ruled that a second execution attempt would not violate the Eighth Amendment's bar on "cruel and unusual" punishments because neither the "psychological strain" endured by Francis nor "the fact that [Francis] ha[d] already been subjected to a current

---

**²**As Justice O'Neill explained in dissent, Francis's murder conviction and resulting death sentence were the product of a deeply racist and unfair criminal justice system. *See Broom*, 51 N.E.3d at 640 (O'Neill, J., dissenting) (citing Miller & Bowman, *Death by Installments: The Ordeal of Willie Francis* (1988)).  Because this aspect of Francis's story is not relevant for present purposes, however, we do not emphasize it here.

of electricity" rendered "his subsequent execution any more cruel in the constitutional sense than any other execution." *Id.* at 464. "The cruelty against which the Constitution protects a convicted man is cruelty inherent in the method of punishment, not the necessary suffering involved in any method employed to extinguish life humanely," the Court added. *Id.* The Court then emphasized that this conclusion held especially true in Francis's circumstance because "[t]here [was] no purpose to inflict unnecessary pain [during the failed execution] nor any unnecessary pain involved in the proposed [second] execution." *Id.*; *see also In re Kemmler*, 136 U.S. 436 (1890) (upholding the constitutionality of the electric chair, as a general matter). In other words, the Court reasoned, Francis was just the "unfortunate victim" of an "accident," akin to a prisoner injured by a "fire in the cell block." *Resweber*, 329 U.S. at 464.

*The Frankfurter opinion.* Justice Frankfurter took a different approach. In his view, the Eighth Amendment did not apply to the states at all, only the Fourteenth Amendment did.[3] And because the Fourteenth Amendment demanded only that the state not "offend[] a principle of justice rooted in the traditions and conscience of our people," and because the state's initial failure to execute Francis was simply "an innocent misadventure" (and hence not in violation of any deeply-rooted "principle of justice"), the Constitution permitted Louisiana to attempt to execute Francis a second time. *Id.* at 470 (citation omitted). Still, Justice Frankfurter cautioned, "a series of abortive attempts at electrocution or even a single, cruelly willful attempt," may "raise different questions," even under the more state-friendly Fourteenth Amendment standard. *Id.* at 471.

*The dissent.* Justice Burton—writing for himself, Justice Douglas, Justice Murphy, and Justice Rutledge—dissented. Like Justice French's principal dissent here, *see supra* at 7, the *Resweber* dissenters did not argue that a second execution attempt would necessarily violate the Eighth Amendment. Rather, the dissenters reasoned, the case needed to be remanded so that a state trial court could discern "the extent, if any, to which electric current was applied to [Francis] during his attempted electrocution." *Id.* at 472. But, the dissenters went on, if "a

---

[3]The Supreme Court has since rejected this view, and has "incorporated" the Bill of Rights, or most of them anyway, so that they apply to the states. *See, e.g.*, *Robinson v. California*, 370 U.S. 660 (1962) (confirming that state governments must comply with the Eighth Amendment).

current of electricity *was* caused to pass through [Francis's] body," intentionally subjecting Francis to that pain again would be cruel and unusual, if not "torture," and would "present[] more tha[n] a case of mental anguish." *Id*. at 476–77 (emphasis added). "The contrast," the dissenters observed, "is that between instantaneous death and death by installments—caused by electric shocks administered after one or more intervening periods of complete consciousness of the victim." *Id*. at 474.

**2.**

With this context, and AEDPA's demanding standard of review, in mind, we now ask whether the Ohio Supreme Court reasonably applied *Resweber* when it rejected Broom's Eighth Amendment claim. We conclude that it did. Although Broom makes a compelling case on the merits, one that some members of the panel might be tempted to accept were this case before us on direct review, *cf. Sireci v. Florida*, 137 S. Ct. 470, 471 (2016) (Breyer, J., dissenting from denial of certiorari) (stating that he "would have heard Broom's claim" on direct review from the Ohio Supreme Court, to determine if a "second [execution] attempt amount[ed] to a 'cruel and unusual' punishment"), Broom cannot show that the Ohio Supreme Court's decision "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement," *Harrington*, 562 U.S. at 103. For better or for worse, five justices in *Resweber* agreed that the Constitution does not prohibit a state from executing a prisoner after having already tried—and failed—to execute that prisoner once, so long as the state (1) did not intentionally, or maliciously, inflict unnecessary pain during the first, failed execution, and (2) will not inflict unnecessary pain during the second execution, beyond that inherent in the method of execution itself. And, for better or for worse, that essentially is what the Ohio Supreme Court held here. Specifically, the court held that (1) "[t]he state's intention in carrying out the execution [was] not to cause unnecessary physical pain or psychological harm," and (2) Broom is unlikely to suffer severe pain during his second execution—or to endure yet another failed execution—because the state has since amended its execution protocols (with the federal courts' approval), and has executed numerous prisoners under those revamped protocols. *Broom*, 51 N.E.3d at 631–32. And thus, the court concluded, the Eighth Amendment did not prohibit Ohio from attempting to execute Broom a second time.

Whatever one may think of that conclusion, it was not an "unreasonable" application of Supreme Court precedent. If anything, it was a direct application of Supreme Court precedent (albeit of a precedent that may have since outlived its usefulness).

Broom's two principal counterarguments do not persuade us otherwise.

*First*, Broom at times emphasizes the views of the *Resweber* dissent, as if to argue that *that* opinion, not the plurality, would constitute the "clearly established" law today, were the Supreme Court to review the issue afresh. *See, e.g.*, Appellant Br. at 57. On one level this argument makes sense. Justice Frankfurter's fifth vote hinged on an outdated understanding of constitutional procedure, *see supra* at n.3, and Justice Frankfurter himself suggested that, but-for that understanding, he might have voted with the dissenters, *see, e.g.*, *Resweber*, 329 U.S. at 471 (Frankfurter, J., concurring) ("Strongly drawn as I am to some of the sentiments expressed by my brother Burton . . . ."). But not only does this argument make *Resweber* even more ambiguous than it already is, which does not help Broom's case on AEDPA review, *see Mitchell*, 540 U.S. at 17, but also it is far from clear that Broom would prevail even under the *Resweber* dissenters' understanding of the Eighth Amendment.

Recall the key fact emphasized by the *Resweber* dissenters: Louisiana had (allegedly, at least) caused a "current of electricity . . . to pass through the body of [Francis]" during its first attempt at electrocution. *Resweber*, 329 U.S. at 477 (Burton, J., dissenting). Consequently, the dissenters reasoned, a second execution attempt would not only cause Francis needless "mental anguish," but it would *physically* be akin to "death by installments [of electricity]," or, more bluntly, "torture." *Id*. at 474, 476–77. Here, by contrast, however inept Ohio's treatment of Broom was during the first execution attempt, at no point during the two-hour ordeal did the state actually inject Broom with any part of its three-drug cocktail. As a result, Ohio is not requesting that it be allowed "two injections per prisoner," the way Louisiana was requesting "two electrocutions per prisoner" with Francis. This distinction may seem trite, but it is the distinction that the *Resweber* dissenters found dispositive, and it would not help Broom here.

*Second*, Broom attacks the reasonableness of the Ohio Supreme Court's conclusion that he is unlikely to face severe pain—or another botched execution—the next time Ohio attempts to

execute him, citing changes to Ohio's lethal injection protocol that occurred in October 2016, after the Ohio Supreme Court's decision. *See* Appellant Br. at 41–42; Appellant Reply Br. at 6–11. Indeed, Broom points out, on November 15, 2017, Ohio tried to execute another inmate, Alva Campbell, under the new, October 2016 protocol, only to give up after "four unsuccessful attempts at IV access." Appellant Br. at 42.**4**

That the Ohio Supreme Court did not have the opportunity to consider these new developments is notable, to be sure. But that fact alone cannot justify habeas relief. For one, this kind of "challenge to the protocol" argument is indistinguishable from the "method of execution" arguments this court reserves for section 1983 suits, *see supra* at 5, and so it is unclear the extent to which this argument is even cognizable on habeas review. After all, the question Broom asked us to answer is whether the Eighth Amendment prohibits Ohio from making an "additional attempt" to execute him *at all*, not whether Ohio's post-October 2016 protocols risk causing an unconstitutional amount of pain, as a general matter. App. R. 16 (COA Order at 3).**5** But even leaving that procedural concern aside, we are hard pressed to conclude that the Ohio Supreme Court's failure to consider the effect of the October 2016 protocol on Broom's future execution renders its decision "unreasonable," and therefore worthy of reversal, when this court has (for better or for worse) since affirmed the constitutionality of that *exact* protocol, on three different occasions, including after the botched Alva Campbell execution. *See In re Ohio Execution Protocol Litig. (Henness)*, 946 F.3d 287 (6th Cir. 2019); *In re Ohio Execution Protocol Litig. (Campbell & Tibbetts)*, 881 F.3d 447 (6th Cir. 2018); *In re Ohio Execution Protocol (Fears)*, 860 F.3d 881 (6th Cir. 2017) (en banc); *see also Glossip*, 135 S. Ct. at 2731 (approving virtually identical procedure from Oklahoma). That is to say, there is no reason to think that, had the Ohio Supreme Court had access to all the information Broom wishes it had access to, it would have come out the other way (much less that clearly established Supreme Court precedent *required* it to come out the other way).

---

**4**As Broom notes, Campbell subsequently died of natural causes, before Ohio could again attempt to execute him. *See* Appellant Br. at 42 n.8.

**5**Indeed, it appears that Broom is still intent on bringing a section 1983 "method of execution" lawsuit after the conclusion of this habeas appeal, *see In re Ohio Execution Protocol Litig. (Broom)*, 2020 WL 401130 (S.D. Ohio Jan. 24, 2020), in which he will presumably challenge the extent to which Ohio's current protocol risks subjecting him to an unreasonably severe amount of pain during the injection process.

All of that said, we emphasize that we do not address the merits of any future "method of execution" challenge Broom may bring.  *See supra* n.5.  Nor do we suggest that we would reach this same conclusion were Ohio to try and fail to execute Broom again.  Rather, we hold simply that the Ohio Supreme Court did not unreasonably apply clearly established Supreme Court precedent when it rejected Broom's "no second execution" Eighth Amendment claim in this instance.

## C.

This leaves Broom's Fifth Amendment claim.  The Double Jeopardy Clause of the Fifth Amendment states that no person shall "be subject for the same offence to be twice put in jeopardy of life or limb."  And in this context the phrase "to be . . . put in jeopardy of life or limb" refers to "[t]he risk of conviction and punishment that a criminal defendant faces at trial." Black's Law Dictionary (11th ed. 2019) (defining "jeopardy").  In most circumstances, the Clause stands for the proposition that, if a state puts a defendant on trial for a crime (and jeopardy *attaches*), and the defendant is then acquitted and released (and jeopardy *terminates*), the government may not try that defendant a second time for the same offense (because that would subject the defendant to *double* jeopardy).  *See, e.g.*, *Sattazahn v. Pennsylvania*, 537 U.S. 101, 106 (2003); *Richardson v. United States*, 468 U.S. 317, 325 (1984); *see also Currier v. Virginia*, 138 S. Ct. 2144, 2149 (2018) (stating that the Clause exists to prevent prosecutors from "treat[ing] trials as dress rehearsals until they secure the convictions they seek").

The Supreme Court has long held, however, that the Clause *also* protects criminal defendants "against multiple *punishments* for the same offense." *North Carolina v. Pearce*, 395 U.S. 711, 717 (1969) (emphasis added) (citing, among other cases, *Ex parte Lange*, 85 U.S. 163, 168 (1873)).  Although this additional protection is enigmatic, and the source of some controversy, *see, e.g.*, *Dep't of Revenue of Montana v. Kurth Ranch*, 511 U.S. 767, 798–805 (1994) (Scalia, J., dissenting) (arguing that the Clause prohibits only successive *prosecutions*, not successive punishments), in more recent times the Court has clarified that this facet of double jeopardy serves a "limited" purpose:  to "ensure that sentencing courts do not exceed, by the device of multiple punishments, the limits prescribed by the legislative branch of government, in which lies the substantive power to define crimes and prescribe punishments." *Jones v. Thomas*,

491 U.S. 376, 381 (1989); *see, e.g.*, *Ex Parte Lange*, 85 U.S. at 175–76 (holding that the sentencing court violated the Double Jeopardy Clause when it punished a criminal defendant with imprisonment *and* a fine when the criminal statute explicitly stated that such a defendant could be punished only with imprisonment *or* a fine).  In other words, "if a legislature permits multiple punishments, a court can impose such punishments; if a legislature prohibits multiple punishments, a court cannot impose such punishments." *Palmer v. Haviland*, 273 F. App'x 480, 484 (6th Cir. 2008).

The Supreme Court has never applied the Double Jeopardy Clause in the particular context of a second execution.  Although Willie Francis raised a double jeopardy concern in *Resweber*, the Court declined to apply the Fifth Amendment Double Jeopardy Clause because, under a then-prevailing precedent, *Palko v. Connecticut*, 302 U.S. 319 (1937), the Double Jeopardy Clause did not even apply to the states.  *See Resweber*, 329 U.S. at 462–63.  Instead, the Court's plurality opinion stated that under *Palko* and the Fourteenth Amendment, there was "no double jeopardy [in *Resweber*] which can be said to amount to a denial of federal due process." *Id.* at 463.  Although *Palko* has since been overruled, *see Benton v. Maryland*, 395 U.S. 784, 793–94 (1969), the Supreme Court has not had occasion to address the question since. A logical application of the more general Double Jeopardy Clause precedent described above, however, suggests that the Clause does not prohibit a second attempt at execution.  This is because, when a capital-punishment state attempts to execute a death-row inmate a second time, following a failed first attempt, the state is neither (1) attempting to subject that defendant to a second trial following an acquittal, nor (2) attempting to impose a "second" punishment beyond that permitted by the legislature.

Nonetheless, we need not reach a definitive conclusion regarding the scope of the Double Jeopardy Clause in the second-execution context because, regardless of the correctness of the Ohio Supreme Court's reasoning, that court plainly did not misapply clearly established Supreme Court precedent.  Indeed, not only is the Ohio Supreme Court's conclusion consistent with the Supreme Court's general double jeopardy jurisprudence, as outlined above, but also the Ohio Supreme Court reached its conclusion without the benefit of *any* on-point Supreme Court guidance, thus rendering AEDPA deference particularly appropriate. *See, e.g.*, *Litschewski v.*

*Dooley*, 792 F.3d 1012, 1016–17 (8th Cir. 2015) (rejecting petitioner's novel double jeopardy claim on AEDPA review and deferring to state court's decision, in large part because the Supreme Court had addressed the issue at only a "high level of generality"); *see also Wright*, 552 U.S. at 126 ("Because our cases give no clear answer to the question presented, let alone one in [the petitioner's] favor, it cannot be said that the state court unreasonably applied clearly established Federal law." (citations omitted)).**[6]**

Broom makes two arguments to the contrary. Neither convinces.

First, Broom makes a textualist argument that, because the state put his life "in jeopardy" once (during the first execution), it would violate the plain language of the Clause to put his life "in jeopardy" again (during a second execution). U.S. Const., amend. V ("[N]or shall any person be subject for the same offence to be twice put in jeopardy of life or limb[.]"); *see, e.g.*, Appellant's Br. at 64. But this argument confuses textualism with literalism. Again, in the context of the Fifth Amendment, it is well established that the phrase "to be . . . put in jeopardy of life" refers to "[t]he risk of conviction and punishment that a criminal defendant faces at *trial*." Black's Law Dictionary (11th ed. 2019) (defining "jeopardy") (emphasis added; *see also* Random House Webster's Unabridged Dictionary 1026 (2d ed. 1993) (distinguishing between jeopardy's ordinary meaning and jeopardy's "legal" meaning). Accepting Broom's contrary, literal definition of "jeopardy" would require the panel to ignore that context, which of course even the most ardent of textualists would not do. *Cf. Deal v. United States*, 508 U.S. 129, 132 (1993) (Scalia, J.) ("Petitioner's contention overlooks, we think, this fundamental principle of statutory construction (and, indeed, of language itself) that the meaning of a word cannot be determined in isolation, but must be drawn from the context in which it is used.").

---

**[6]**If anything, the Ohio Supreme Court's reasoning may have been *more* favorable to Broom than U.S. Supreme Court precedent required it to be. That is because the court implied that, had the first execution attempt proceeded "to the point of injection of a lethal drug into the IV line," and failed, the Clause *would* have prevented Ohio from attempting to execute Broom again. *See Broom*, 51 N.E.3d at 627 (stating that because the state's first execution attempt "did not proceed to the point of injection of a lethal drug into the IV line, jeopardy never attached," and, as a result, a second execution attempt would not implicate "the Fifth Amendment protection against double jeopardy"). For the reasons explained above, this proposition is debatable. But because the state court's ultimate conclusion was not in defiance of clearly established Supreme Court precedent, we need not say more here.

Second, Broom latches onto the phrase "no man can be twice lawfully punished for the same offence"—a double jeopardy maxim dating back to *Ex parte Lange*—to argue that, if Ohio attempts to execute him again, it would run afoul of this well-established command (presumably because a second execution attempt would constitute a verboten "second punishment"). Appellant Reply Br. at 16. But just as Broom's prior argument read the term "jeopardy" out of its definitional context, this argument reads the *Lange* maxim out of its precedential context. As the Supreme Court explained in *Jones v. Thomas*, *Lange* "stands for the uncontested proposition that the Double Jeopardy Clause prohibits punishment *in excess of that authorized by the legislature . . . not for the broader rule suggested by its dictum*." 491 U.S. at 383 (emphasis added). And because allowing Ohio to complete its execution of Broom would not go beyond what Ohio's legislature has authorized—for better or for worse, Ohio still permits capital punishment—the *Lange* maxim cannot help Broom here.

### III.  CONCLUSION

For these reasons, we **AFFIRM** the district court's judgment.